[Civ. No. 67843. Second Dist., Div. One. July 27, 1983.]

CALIFORNIA UNION INSURANCE COMPANY,
Plaintiff and Appellant, v.
LANDMARK INSURANCE COMPANY, Defendant and Respondent.

463

## Counsel

Duryea, Hogan & Baynes, Hogan, Baynes & Haworth, Timothy J. Hogan and Shari Perrin Mason for Plaintiff and Appellant.

John G. Kerr for Defendant and Respondent.

## Opinion

**RILEY, J.**\*—In February 1982, plaintiff California Union Insurance Company (Cal Union hereafter) filed a declaratory relief action against defendant Landmark Insurance Company (hereafter Landmark). The case involves a controversy between the two companies, the only parties to the litigation, concerning their respective obligations to a property owner claimant (Westmont Gardens) as to which of their policies, as successive carriers, covers a loss.

In the lower court defendant contended the water damage the claimant suffered resulted from two different occurrences, and that plaintiff must provide coverage for damage flowing (no pun intended) from the "occurrence" which happened while its policy was in effect. Plaintiff contended that all the damage to the claimant stemmed from one occurrence and that defendant was liable for the entire loss, as the occurrence first manifested itself during the defendant's policy period.

*Assigned by the Chairperson of the Judicial Council.

The case was tried before a retired judge of the superior court, sitting as a judge pro tem., and was presented upon an agreed statement of facts, the respective policies and the briefs submitted by the parties.

Judgment was entered in favor of defendant Landmark and against plaintiff Cal Union on May 4, 1982.

This appeal followed.

### THE INSURING AGREEMENTS

Landmark and Cal. Union were the general liability insurers of Palos Verdes Health Spa, Inc. for consecutive policy periods from July 14, 1978, to July 14, 1981.

The critical terms of the policies involved in this dispute are identical and read as follows:

" 'An occurence' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Similarly identical are the definitions in the policies applicable to the preceding sections:

" 'Property Damage' means (1) physical injury to or destruction of the tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) a loss of use of tangible property which has not been physically injured or destroyed provided such loss of use was caused by an occurrence during the policy period. . . .

"For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions should be considered as arising out of one occurrence."

### STATEMENT OF FACTS

As previously indicated, the case was presented on an agreed statement of facts, which we quote in pertinent part:

"On March 18, 1978, Westmont Gardens, as 'landlord' and Sam and Lonna Calhoun, dba 'Palos Verdes Health Spa of San Pedro' as 'tenant'

entered into a written Lease of certain premises located in the Garden Village Shopping Center, 28046 Western Avenue, San Pedro, California.

"In accordance with the terms of the Lease, Calhoun contracted with Clauson Construction Company for the construction of a swimming pool on the leased premises. Construction of the swimming pool was completed on June 18, 1979, and the pool was then filled with water."

It was later learned that "the pipes to the swimming pool, and possibly the swimming pool itself, leaked. This caused the progressive saturation of the adjoining compacted fill slopes. As a result, the slopes then failed and over the period July, 1979, to November, 1980, damage was caused to property owned by Westmont Gardens. The damage was initially repaired in July and August of 1980, and subsequent damage developed in November of 1980, after the (July/August) repairs were completed. It was not determined until late 1980 or early 1981 that leakage from the swimming pool was the underlying cause of the problem."

As a further part of the factual picture, in July 1979, claimant Westmont retained a geological consulting firm to inspect the erosion in the compacted slopes around the leased premises. At that time, this was the only damage apparent. The geologist concluded that there was near-surface soil instability, probably as a result of improper construction of drainage gutters. (As we shall see, attention had not yet focused on the real culprit.)

The July 1979 damage continued and expanded through March 1980. On March 5, 1980, the geological firm issued its second report. The trouble was more extensive and consisted of slumps, scarps, mudflows and other soils phenomena. Subsurface testing found the area to be heavily saturated. The geologist concluded the conditions had been caused by overwatering in conjunction with a record rainfall. (The swimming pool and its attendant fittings were still not under suspicion.)

Continuing with the recitals of the agreed statement of facts:

"In July of 1980, the damage to the slopes was repaired by Westmont Gardens, and pursuant to an agreement between the parties, Westmont has been reimbursed for the cost of repairs.

"In October of 1980, a wide crack was noticed in the north end of the swimming pool. The pressure lines to the pool were tested, and it was found that a pressure line to the pool was defective and had leaked since the pool was filled on June 18, 1979. The water line to the pool leaked continuously;

and the pool itself leaked during the period and after October of 1980. The possibility also exists that the pool itself leaked prior to October of 1980.''

After an interim report on January 5, 1981, in which the firm focused its attention on the pool for the first time,[1] on February 3, 1981, the geological firm issued a report which set forth the "most reasonable sequence of events" as follows (again quoting from the agreed statement):

"1. The swimming pool was constructed in improperly prepared subgrade; i.e. disturbed material.

"2. After a time, the subgrade consolidated and the overlying pool shell cracked.

"3. The swimming pool developed leakage.

"4. The fill beneath the pool, structure and surrounding area became saturated as a result thereof. Lateral transmission of pool water was facilitated by sand lenses in the fill.

"5. Pool water exiting the slopes significantly contributed to surficial failures, which occurred during the past 2½ years.

"6. Pumping of pavement in the area resulted from saturation of the underlying fill and subsequent traffic loading.

"7. Structural distress to the building occurred after saturation and resulting consolidation of underlying fill materials.

"Please note that events 4, 5, 6 and 7 may have occurred in a different order, or concurrently."

The agreed statement of facts continues:

*"For purposes of this case, the parties agree that all of the damage, July, 1979, to November, 1980, was caused by the swimming pool which began to leak on or about June 18, 1979.* [Italics added.]

"Landmark insured Palos Verdes Health Spa, Inc., under its Special Multi-Peril Policies Nos. SMP800-05-18 for the periods July 14, 1978 to July 14, 1980.

---

[1] By no means do we imply that the geological consulting firm was less than competent in not discovering the root source of the claimant's soil and slope damages at an earlier time.

"Cal Union insured Palos Verdes Health Spa, Inc., under its General Liability Policy No. CCGO2-03-10 for the period July 14, 1980 to July 14, 1981.

"Only the damage that developed during October and November 1980 is in dispute. Landmark contends that this damage is a separate 'occurrence' within the terms and conditions of the Cal Union policy, and, thus, the responsibility of Cal Union. Cal Union contends that the damage is a continuation of that 'occurrence' which incepted during the period of coverage provided by the Landmark policies, and, thus, the responsibility of Landmark."

## Issues Presented

The issues which have been framed by the parties for our consideration are:

I. "With respect to the damage that developed during the period of coverage provided by the Cal Union policy, does it constitute a separate 'occurrence' for purposes of coverage, or is it a continuation of but one 'occurrence' which incepted during the Landmark period of coverage?"

II. "Which carrier under the respective policies is obligated to pay for the damage that developed after August, 1980: Landmark, Cal Union, or both?"

## Discussion—The Occurrence

■ Having been submitted to the trial court upon an agreed statement of facts, we are not confronted with conflicting evidence. Thus, we are not bound by the substantial evidence rule. The trial judge's findings do not foreclose our own examination of the facts, and our obligation is to determine the questions of law presented by the stipulated facts. (*Container Corp. of America* v. *Franchise Tax Bd.* (1981) 117 Cal.App.3d 988 [173 Cal.Rptr. 121], and cases therein cited.)

In the case at bench the parties have stipulated "that *all of the damage, July 1979 to November 1980, was caused by the swimming pool which began to leak on or about June 18, 1979.*" (Italics added.)

The situation in which the claimant found itself may be analogized to an individual who begins to be troubled with a backache. The physician must examine for several possible conditions: spinal anomalies, ligamentous strain, arthritis, metabolic disorders, and infection, among others. After the

examiner has ruled out all of the above, he may find that the cause of all his patient's complaints has been a ruptured disc which was unquestionably the reason for the backache in the first place. When did the disc rupture? We may not be able to fix the precise date, but we can say with reasonable certainty that the disc's impingement upon the nerve root was the neurological occurrence triggering the back pain.

So, here, too, we can infer with more than a reasonable degree of confidence that the pool leakage which began in June 1979 triggered a series of surface and subsurface soil anomalies which proximately caused all subsequent damage. Indeed, the parties concede this position. However, a careful reading of the reasoning of the trial judge leads us to the conclusion that, at least as one of the bases of his decision, he was not convinced that the leakage set in motion a continuous chain of events which made the October and November 1979 damage inevitable.

Quoting in part from the statement of decision: "It is mere assertion, not sufficiently supported by the record in the agreed statement that the damage later manifested (i.e. after defendant's policy period) is in some manner to be viewed as but another facet of the type of damage first manifested and an extension thereof. Physically it is not of the same type although indubitably generated from the same cause. . . . For all we know, the later damage might never have manifested itself if the repairs had not been made to the first manifested damage considering the vagaries and meanderings of flowing water. Also, who can say one way or the other that the nature of those repairs did or did not independently cause the later damage to be 'manifested' . . . . Landmark's policy period terminated July 14, 1980, and we cannot speculate that 'the summer of 1980' is of sufficient probative significance so as to predate July 14, 1980. This crucial element of proof must be shown by a preponderance of the evidence, and not by speculation, to predate July 14, 1980."

The court went on to hold that each manifestation of damage should be treated as a separate "occurrence" under the policies, rejecting plaintiff's contention that each manifestation which is joined by the same underlying cause constituted a continuous "occurrence." Additionally, the court held that an insurer should not be responsible for damages which occurred outside the insurer's policy period.

What the court was saying is that "occurrence" is equated with manifestation of damage without regard to cause, and this seems to fly in the face of identical language in both policies:

". . . [A]ll . . . property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

■ According to both parties, *Remmer* v. *Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84 [295 P.2d 19, 57 A.L.R.2d 1379] sets forth the general rule in this state that the "occurrence" of an accident is the time when the complaining party is actually damaged, rather than when the wrongful act was committed. As applied to our case, Landmark says that repairs made prior to July 14, 1980, put an end to the previous damage, and the October and November 1980 damage was new damage, and a new "occurrence," albeit sequential. Cal Union, on the other hand, argues that the first manifestation of damage occurred in October 1979, and the damage thereafter was continuous, and since the Landmark policy was in effect in October 1979, Landmark is responsible for all damage occurring from the same cause. In the context of *Remmer's* facts and its pleadings, the case is inapposite to our determination.

*Remmer* v. *Glens Falls* was the legitimate scion of a prior action, *Morris* v. *Remmer*. Morris owned property on the downhill side of Remmer. In 1947 Remmer engaged in some cutting and filling on his property, thus changing its natural contours. In January 1952, an earth and rock slide from Remmer's property overran Morris' adjacent land. Glens Falls had issued a comprehensive personal liability policy to Remmer on October 26, 1945. Even though the policy term was for three years, for some reason or other it was cancelled January 15, 1948. When Morris brought suit against Remmer on April 18, 1952, Remmer tendered defense of the litigation to Glens Falls. The carrier denied coverage on the ground that the Morris claim was not based upon an "occurrence" taking place while the policy was in effect.

But, the basis for the Morris suit was that Remmer had created a present nuisance, currently maintained and currently threatening injury. As the *Remmer* court pointed out, in 1952 Morris could not have successfully sued for damages in the 1947 creation of the nuisance, because such cause of action would have been barred by either the three- or four-year statute of limitations. (Code Civ. Proc., §§ 338, subd. 2 and 343.) The court went on to hold that the Morris lawsuit, for a present nuisance, was not an "occurrence" within the policy period. As it stated, "We are not interested in ascertaining what theory the Morrises could have sued upon, but upon what theory they did sue upon . . . . The cause of action pleaded was necessarily, therefore, not for an 'occurrence' within the time limits of the policy." (At p. 89.)

But, without limitation or qualification, *Remmer,* as a "well established" general rule lives on. Landmark invites our attention to a case decided 20 years later in which *Remmer* was cited as persuasive, if not controlling, authority.

*Tijsseling* v. *General Acc. etc. Assur. Corp.* (1976) 55 Cal.App.3d 623 [127 Cal.Rptr. 681] was an action concerning coverage under a comprehensive general liability policy issued to Tijsseling for a three-year period, November 1, 1967, to 1970. Some years before 1967, Tijsseling sold two adjoining lots to two separate buyers. The lots had houses on them. In 1967 and 1968 the buyers or their successors learned that one of the houses encroached upon the adjacent lot, and suit was filed. Judgments were recovered against Tijsseling for negligent misrepresentation. Tijsseling then filed an action for declaratory relief and breach of contract against several carriers and brokers, including General. Upon motion, General was awarded summary judgment on the ground that the events upon which Tijsseling's liability was predicated had occurred prior to the coverage of General's policy. Noting that the encroaching building was constructed, and the misrepresentations were made, prior to the period of General's policy, that is, prior to 1967, the court paid its obeisance to *Remmer* in holding that the buyers were damaged when the misrepresentations were made, and not upon the occurrence of the discovery of the encroachment by the buyers.

As supportive of the general rules of *Remmer* and *Tijsseling,* Landmark directs our attention to *Arant* v. *Signal Ins. Co.* (1977) 67 Cal.App.3d 514 [136 Cal.Rptr. 689]. This was an action by an attorney against his malpractice insurance carrier for indemnity for the carrier's failure to defend him in an action brought by a former client. Over a period of three years beginning September 3, 1971, Signal issued three consecutive annual policies insuring Arant against acts amounting to legal malpractice.

The attorney-client relationship between Arant and his client had begun in 1955. Between the years of 1962 and 1967, Arant gave his client, Held, certain advice regarding the latter's rights to royalties from Held's employer pursuant to an employment contract which Arant had drafted. It was Signal's position that the "occurrence" causing the damage was Arant's erroneous counsel between 1962 and 1967, and coverage under Signal's policy did not begin until 1971. Thus, said Signal, since "acts committed prior to the beginning of the policy period," by the terms of the policy are specifically excluded from coverage, Arant's 1962 to 1967 conduct was not insured.

Arant, of course, contended "that the adverse impact of [his] advice did not occur until September 1972 when he retracted it." (At p. 517.) It was not until after that date, he argued, that the client, Held, made a determination to settle the lawsuit against him, paying some $130,000 to his employer. Therefore, says Arant, the client's decision was the act or "occurrence" by which the damage was fixed and "actually accrued" under *Remmer* and *Tijsseling.*

The *Arant* court, as might be expected, made genuflection to *Remmer* and *Tijsseling*—that "the *occurrence* of an accident within the meaning of an indemnity policy is the time that the damages insured against actually accrue." (At p. 516.) Thus, the court reasoned, the injury occurred when the advice (later retracted as erroneous) was given and that was prior to the beginning of the policy period.

Similarly, *Maples v. Aetna Cas. and Surety Company* (1978) 83 Cal.App.3d 641 [148 Cal.Rptr. 80] involved an occurrence type policy of liability insurance in which a plumber claimed coverage for a fire allegedly caused by his negligent installation of a low pressure boiler some six years earlier. Aetna covered Maples at the time of the installation but had been off the risk for four years when the fire occurred. Citing *Remmer, Tijsseling,* and *Arant,* among others, the *Maples* court held that the policy provisions for coverage applied not to the time the wrongful act was committed, but rather to the time the complaining party was actually damaged.

In *Employers Casualty Co. v. Northwestern Nat. Ins. Group* (1980) 109 Cal.App.3d 462 [167 Cal.Rptr. 296], a mobile home manufacturer had first been insured with Northwestern, and successively with Employers. A vehicular accident occurred during the latter's policy period, although there were certain allegations in the underlying complaint that the manufacturer's negligent conduct had in fact occurred during the Northwestern policy term. Northwestern was absolved from responsibility on the authority of *Maples* and *Remmer.*

*Chamberlin v. Smith* (1977) 72 Cal.App.3d 835 [140 Cal.Rptr. 493], involved a determination of which of three successive legal malpractice insurance carriers should provide coverage to an attorney whose use of an outdated financial statement in the preparation of an agreement for the sale and purchase of corporate stock led to a substantial loss to his client. The court held that even though the financial loss came later, the damage was irremediable as of the date of the execution of the agreement. Thus, the carrier on that date was solely responsible.

It is difficult, if not downright impossible, to reconcile the foregoing authorities. *Remmer* says the "occurrence" date is the date of the actual damage and not the date of the wrongful act, but *Remmer* was bottomed on a present nuisance theory. In *Tijsseling,* the case of the encroaching house, the "occurrence" date was found to be the date of the wrongful act, to wit, the misrepresentation, long before the encroachment became known. *Arant* and *Chamberlin,* the legal malpractice cases, found the "occurrence" dates to have been the date of the wrongful act, specifically the date of the erroneous advice, even though the fact of damages was as yet unknown to their

respective clients. Maples, with the negligently installed boiler, fixed the "occurrence" date as the date of the fire, rather than the date of the wrongful act, the negligent installation of the unit. In *Employers,* the date of a vehicle accident became the "occurrence" date and not the date of the manufacturer's prior negligence.

There is an additional bedeviling factor in the case at bench. All of the damage to the claimant's property here, occurring from July 1979 to November 1980, was caused by the swimming pool. The parties have so stipulated. Since the pool was an integral part of the health spa, we can fairly assume it was kept filled throughout this entire period of time. Certainly there is no hint to the contrary in the record. If the pool was filled about June 18, 1979, and the pool thereupon began to leak, as the parties have also agreed, then the leakage process was a continuous one for a period of time in excess of 18 months.

It does not require any citation of authority, nor do we need the opinion of an experienced hydrologist, to find that for the entire period of time the damage was accumulating and becoming progressively more severe—a factual and physical situation not present in the cases to which our attention has been called by Landmark.

In *Remmer* a dangerous condition failed to cause damage for five years. In *Tijsseling* the encroachment existed for "some years" before its discovery. The attorney in *Arant* gave erroneous advice from 1962 to 1967, retracted it in 1972 and was later sued by his client. The boiler in *Maples* functioned for six years prior to the fire it caused. The alleged negligence of the insured in *Employers* predated the accident-loss approximately one year. The attorney's wrongful act in *Chamberlin* cost his client some money at an undetermined later time.

Without exception all of the foregoing cases involved delays in varying periods of time between the wrongful act and the actual loss. Not one involved a continuous active force at work between the parameters of those dates. Not one involved a condition of progressively worsening damage to the property of another, occurring day after day, week after week and month after month. And here, it all began during the period of time in which Landmark afforded coverage.

We hold that the facts and circumstances of this case are squarely within the embrace of the "one occurrence" provisions, identical in the policies of both Cal Union and Landmark.

From respondent's policy, form MP-200, page 2; and appellant's policy indorsement No. 1: "For the purpose of determining the limit of the com-

pany's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

DISCUSSION—THE COVERAGE

■ Having made our determination that we are dealing with a "one occurrence" case, we now turn to the question of coverage. True, Landmark was off the risk when the true villain of the piece was unmasked, and when the damage of October/November 1980 became apparent. Our attention is directed to the explicit language of the Landmark policy:

"This insurance applies only to accidents which occur during the policy period . . . ."

Because of the above policy provision, are we obliged to make a determination that the October/November 1980 damage is solely the responsibility of Cal Union? Again, the heretofore mentioned authorities are a mixed bag.

Glens Falls had been off the Remmer risk for four years when the slide occurred. (Loss not covered.) General was not to come onto the risk "for some years" after the misrepresentations in *Tijsseling,* although General was the carrier when the encroachment was discovered. (Loss not covered.) Arant's errant advice was given four to nine years before Signal became his carrier. (No coverage.) Maples had an Aetna policy at the time of his negligent installation of the boiler, but Aetna had been off the risk for four years when the fire occurred. (No coverage.) Employers had to pick up the whole package when the accident occurred during its policy period even though the negligence was within the Northwestern time frame. In *Chamberlin* the carrier which provided coverage at the time the attorney drew an improper agreement was required to step in, although the damage was not to be ascertained until later.

However, as we have already noted, none of those cases are of the continuous, progressive damage variety. In any event ample authority exists for us to hold that a carrier's responsibility may continue even after the term of the policy has expired.

*Snapp* v. *State Farm Fire & Cas. Co.* (1962) 206 Cal.App.2d 827 [24 Cal.Rptr. 44] was a declaratory relief action to determine the extent of the carrier's liability, both before and after the expiration of the policy term, for damage to the insured premises resulting from a landslide. The effective date of the coverage was November 15, 1956, and was to continue for a

three-year term. The court was dealing with a California standard form fire insurance policy. It contained an indorsement which extended coverage to insure against all risks of physical loss to the property. During the policy term the land beneath the Snapp residence began to move laterally due to an unstable land fill and heavy rainfall. The trial court ruled that State Farm was liable only to the extent of the damages sustained before the expiration of the policy period.

In reversing, the *Snapp* court made reference to a specific finding that the "movement is still active and is without definite prospect of stabilization." (At p. 831.) The court continued: "To permit the insurer to terminate its liability while the fortuitous peril which materialized during the term of the policy was *still active* would not be in accord either with applicable precedents or with the common understanding of the nature and purpose of insurance; it would allow an injustice to be worked upon the insured by defeating the very substance of the protection for which his premiums were paid. (Italics added.)

"Once the contingent event insured against has occurred during the period covered, the liability of the carrier becomes *contractual* rather than *potential* only, and the sole issue remaining is the extent of its obligation, and it is immaterial that this may not be fully ascertained at the end of the policy period." (Italics in original.) *Snapp, supra,* 206 Cal.App.2d 827, 831-832.

Thus, *Snapp* stands for the proposition that an insurer's liability for a still-insured and continuing event is not terminated by the expiration of the policy term.

In *Harman* v. *American Casualty Co. of Reading, Pa.* (C.D.Cal. 1957) 155 F.Supp. 612, another land slippage case, the carrier issued notices of cancellation of its fire insurance policy (including an indorsement insuring the premises against all physical loss) during a period of time when the damage had been found to be "substantial and continuous." (At p. 613.) It argued that by so doing its policy did not cover any damages occurring after the cancellation. The court made short work of the contention: "[S]aid *notices of cancellation would not terminate liability where a continuing loss had already commenced, until the loss by damage had been complete or the cause of the loss had ceased* . . . nor would the expiration of the policy affect the liability of the Defendant where the damages continue incessantly . . . nor would an event which would terminate the policy abrogate the coverage after the loss insured against commences. [Citations omitted.]" (Italics added.)

In *United States Fidelity & G. Co.* v. *American Ins. Co.* (1976) 169 Ind.App. 1 [345 N.E.2d 267], the Indiana Court of Appeals considered a

declaratory relief action which sought a determination of the respective liabilities of three insurance carriers providing products liability coverage to Adams, a brick manufacturer. Each of the three companies agreed to pay property damage "caused by an occurrence." Occurrence was defined as " 'an accident . . . which results, during the policy period, in . . . property damage neither expected nor intended from the standpoint of the insured.' " (At p. 268.) (Interestingly, the USF&G definition of occurrence did not contain the "including continuous or repeated exposure to conditions" language of the policies of the parties in the case at bench.)

In any event, bricks manufactured by Adams spalled—chips or flakes of the brick surface broke off—during the policy periods of all three insurers. After making the irresistible observation, "The parties agree the spalling is appalling," (at p. 270) the Indiana court held that the carrier providing products liability coverage at the time the spalling first became apparent was responsible for all loss or damage even though further damage occurred after the expiration of the policy period. "[I]f the initial spalling is notice of possible defectiveness of the entire structure, all damage will accrue in the policy period when the spalling first becomes apparent.

"Our conclusion must be that 'property damage' occurs to the entire structure in the policy period when the spalling first becomes apparent and is not equated with the number of bricks which have been spalled in any given policy period." (At p. 271.)

Therefore, under the authority of *Snapp, Harman* and *United States Fidelity & G. Co.,* we are constrained to hold that in a "one occurrence" case involving continuous, progressive and deteriorating damage, the carrier in whose policy period the damage first becomes apparent remains on the risk until the damage is finally and totally complete, notwithstanding a policy provision which purports to limit the coverage solely to those accidents/ occurrences within the time parameters of the stated policy term.

One aspect of this entire set of circumstances remains to be explored. Holding as we have that Landmark cannot escape responsibility here for pool leakage damage occurring after July 14, 1980, the stated final date of their policy period, and the date upon which Cal Union began its year of coverage, do we mean to adopt a position that Cal Union has no liability under its policy and thus gets a free ride? While it is true that the force producing the damage was already in motion when Cal Union came on the risk, that damage-causing force continued and further substantial corrective procedures were necessary after the October/November 1980 damage manifested itself, albeit its cause had its genesis in June 1979, when the pool was installed and filled.

The precise question has been addressed for us in some provocative and persuasive cases which we now proceed to examine.

*Gruol Construction Co.* v. *Insurance Co. of No. Amer.* (1974) 11 Wn.App. 632 [524 P.2d 427] was an action against Gruol's three insurance carriers for breach of their insurance contracts. Gruol had built and sold an apartment building in 1963. In 1968 he was sued by the purchaser for damage caused by dry rot resulting from dirt having been piled against the building's box sills by backfilling during construction. Safeco, INA and Northwestern Mutual had been Gruol's insurance carriers in successive years, 1962 to 1968. All three denied coverage and refused to defend. The trial court found them to be jointly and severally liable and the court of appeals affirmed. Holding that the dry rot was an accident or occurrence within the terms of the three policies, the Washington court found the damage to have been a continuing condition. "The accident mentioned in the policy need not be a blow but may be a process . . . 'even though there is a lapse of time between the initial negligent act and the occurrence of the ultimate damage . . . .' " (At p. 430.) Ruling that the trial court properly found joint and several liability, the court held that while the damage did in fact continue over a period of years, it was still a single injury, and that the burden of apportionment of the damage was upon the carriers.

*Ins. Co. of North America* v. *Forty-Eight Insulations* (6th Cir. 1980) 633 F.2d 1212 was an action to determine the obligation of five named insurance companies to defend and indemnify the manufacturer of asbestos products for resultant judgments anticipated against it in numerous pending lawsuits. After several paragraphs devoted to demonstrating that asbestosis is an insidious progressive disease, taking many years to develop, the court faced the question as to which carrier or carriers should be responsible—should the manifestation theory prevail (the date of diagnosis), or should it be the exposure theory and all carriers providing coverage from the time of the worker's initial exposure to the time of diagnosis be held jointly and severally liable.

The Sixth Circuit affirmed the district court in its determination of the exposure theory. The court reasoned that because asbestosis (the damage) is a cumulative disease, a distinction had to be made from the ordinary accident or disease situation, and because the injury is a continuing one the carrier(s) who provides a comprehensive general liability policy would expect coverage to parallel the theory of liability. Because of the adoption of the exposure—"one occurrence"—rule, the court rather summarily dismissed contentions purporting to limit causes of action to those accruing within the stated policy period. (It should be noted that in their definition of "occurrence," the carriers had included a provision referring to "con-

tinuous or repeated exposure to conditions resulting in injury.") Joint and several liability was imposed.

Similarly, in *Keene Corp.* v. *Ins. Co. of North America* (D.C.Cir. 1981) 667 F.2d 1034, the manufacturer of insulation products containing asbestos brought an action for a declaratory judgment seeking a determination of the obligations of four insurance carriers to defend and indemnify it in pending products liability litigation. Holding that the "occurrence" which caused the injury took place substantially before the manifestation of the ultimate injury (the disease), the District of Columbia Circuit found each insurer on the risk between the initial exposure and the manifestation of disease to be liable for indemnification and defense costs.

Citing *Snapp* and *Harman, supra,* with approval, the court commented: "These cases illustrate the principle that when it becomes known that an occurrence has set in motion a process that has a significant probability of resulting in a covered loss, the insurer on the risk at that time is liable for the full loss." (At. p. 1046.)

On the subject of the extent of the coverage, the court explained the last sentence quoted above: "We conclude that the insurer is liable in full, subject to the 'other insurance' provisions [of the policy] . . . ." (At p. 1047.)

Again, joint and several liability was imposed.

We are fully mindful of the fact that *Forty-Eight Insulations* and *Keene* are products liability cases. But, as in the case at bench, the policies cover single accident/occurrence, continuing damage claims. Additionally, the policies involved are ones of general comprehensive liability, and, in our view, any distinction is more imaginary than real.

In passing, we note that in cumulative injury cases in California, apportionment between compensation insurers has long been the rule. (See e.g., *Fireman's Fund Indem. Co.* v. *Ind. Acc. Com.* (1952) 39 Cal.2d 831 [247 P.2d 707]; *City of Torrance* v. *Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371 [185 Cal.Rptr. 645, 650 P.2d 1162]; Lab. Code, § 5500.5.)

We therefore hold that as to the October/November 1980 damage, Landmark and Cal Union are jointly and severally liable to the full amount of such damage. Inasmuch as we have been advised that the limits of both policies are identical, allocation poses no problem, and each is ordered to pay one-half (1/2) thereof.

## Disposition

The judgment of the court below is affirmed in part, in that Cal Union shall pay one-half (1/2) of the October/November 1980 damage, and reversed in part insofar as it exonerates Landmark who shall also pay a one-half (1/2) share.

Hanson (Thaxton), Acting P. J., and Dalsimer, J., concurred.