**TBG, INC., Plaintiff,**

**v.**

**COMMERCIAL UNION INSURANCE COMPANY, Defendant.**

**No. C 89–2374 FMS.**

United States District Court,
N.D. California.

June 4, 1990.

Paul A. Zevnik, Michel Y. Horton, Kaye Scholer Fierman Hays & Handler, Los Angeles, Cal., Fredric W. Yerman, Kaye Scholer Fierman Hays & Handler, New York City, for plaintiff.

Jeffrey N. Haney, Mark L. Nissenbaum, Bishop Barry Howe Haney & Ryder, San Francisco, Cal., for defendant.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

FERN M. SMITH, District Judge.

This is a declaratory judgment action in which the plaintiff seeks to recover from its insurer environmental response costs incurred in the EPA-mandated cleanup of a site contaminated with hazardous wastes. The matter is currently before the Court on the parties' respective motions for partial summary adjudication as to the scope of the insurance coverage issued to the plaintiff by the defendant. For the reasons discussed herein, the Court holds that costs incurred in cleaning up a site contaminated with hazardous waste pursuant to liability imposed or acknowledged under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, ("CERCLA") are "damages" within the meaning of the comprehensive general liability policies at issue in this case, and that coverage under these policies was "triggered" at the time the site was exposed to hazardous materials.

### FACTUAL BACKGROUND

The plaintiff, TBG, Inc. ("TBG"), and its predecessors, Indian Head, Inc. and MGM Brakes, Inc., owned and operated a brake manufacturing plant in Cloverdale, California from 1967 to 1984. From 1965 to 1972, TBG used hydraulic fluids containing polychlorinated biphenyls (PCBs) in its manu-facturing operations. During this period, waste water containing PCBs was periodically discharged from the plant into an adjacent field. As a result, TBG's property and adjacent parcels of land were contaminated with PCBs, substances deemed hazardous pursuant to Section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601(14).

The Environmental Protection Agency ("EPA") began investigating the site in the early 1980s. On September 8, 1983, the site, which consists of the land owned by TBG as well as four adjacent parcels owned by third parties, was placed on the National Priorities List (NPL) and designated the "MGM Brakes Superfund Site" (hereinafter "the MGM Brakes Site" or "the Site"). The EPA's Record of Decision on the MGM Brakes Superfund Site reported that soil on the Site is contaminated with PCBs to a depth of 29 feet. Groundwater and surface water running off the Site, were also found to be contaminated with PCBs. Air samples taken at the Site contained PCBs. In addition, volatile organic compounds (VOCs) were detected in groundwater on the Site.[1] In its Record of Decision, the EPA concluded that there had been releases of hazardous substances on the Site, and that the Site posed a continuing health threat to humans and animals.

On November 14, 1989, the EPA filed a complaint against TBG in this Court under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607, seeking "injunctive relief to abate an imminent and substantial endangerment to public health or welfare" and "recovery of response costs incurred or to be incurred by the United States" in connection with the EPA's investigation of the MGM Site. *See*, Complaint, *United States of America v. TBG, Inc. and Indian Head Industries, Inc.*, Civil Action No. C–89–4047 JPV, at 2. Prior to the filing of the complaint, in July of 1989, TBG and EPA had negotiated a consent decree. That agreement was filed with the Court on November 22, 1989. Pursuant to its terms, TBG agreed to clean up the Site,

---

**1.** The source of the VOC contamination is unknown.

at an estimated cost of $7 million, and to reimburse the EPA for approximately $900,000 in expenses incurred by the EPA in its investigation of the Site. TBG now seeks to recover those response costs from its insurer.

During the years between 1966 and 1970, when much of the PCB contamination on the MGM Site occurred, TBG was insured by Commercial Union Insurance Company under five comprehensive general, umbrella, and excess liability insurance policies. In June of 1989, TBG tendered a claim to Commercial Union requesting coverage for costs incurred in the cleanup of the MGM Site. Commercial Union denied any duty to indemnify TBG for the cost of the cleanup. Shortly thereafter, on June 27, 1989, TBG filed this action seeking a declaration from this Court as to the parties rights and obligations under the insurance policies at issue.

The matter is now before the Court for summary adjudication of three separate issues: (1) whether the response costs incurred by TBG in defending the EPA action, reimbursing the EPA for its investigation costs, and cleaning up the MGM Brakes Site are "damages" within the scope of the comprehensive general liability policies issued by Commercial Union during the relevant years; (2) whether, and under what theory, coverage under the insurance policies was triggered; and (3) whether TBG has the right to allocate its losses to particular policies and policy years, at its election.

## ANALYSIS

### I. "Damages" Issue.

A comprehensive general liability ("CGL") policy typically provides coverage for any damages the insured becomes obligated to pay as a result of a legal action. The parties agree that the question presented in this case is whether, under California law, environmental response costs incurred as a result of action taken by the EPA under CERCLA constitute "damages" within the meaning of a CGL insurance policy.

### A. Policy Terms.

The resolution of this question rests primarily on an interpretation of the terms of the insurance policies at issue, which is a legal determination. *Congleton v. Nat'l Union Fire Ins. Co.*, 189 Cal. App.3d 51, 59, 234 Cal.Rptr. 218 (1987), *rev. denied*, March 25, 1987. This determination must be made in reliance upon the rules of interpretation developed by California courts that govern the interpretation of insurance contracts. *Intel Corp. v. Hartford Accident and Indemnity Co.*, 692 F.Supp. 1171, 1181 (N.D.Cal.1988), *appeal pending*. Words used in an insurance policy are to be interpreted in their plain, ordinary and popular sense, according to the plain meaning which a lay person would ordinarily attach to them. *General Ins. Co. of America v. City of Belvedere*, 582 F.Supp. 88, 89 (N.D.Cal.1984); *Reserve Insurance Co. v. Pisciotta*, 30 Cal.3d 800, 807, 180 Cal.Rptr. 628, 640 P.2d 764 (1982). Any ambiguity in an insurance policy or uncertainty as to its scope is to be resolved against the insurer. *Reserve, supra*, 30 Cal.3d at 807, 180 Cal.Rptr. 628, 640 P.2d 764; *see also, Admiralty Fund v. Peerless Ins. Co.*, 143 Cal.App.3d 379, 385, 191 Cal. Rptr. 753 (1983). Whenever semantically permissible, the contract should be interpreted to achieve its object of providing indemnity for any loss to which the insurance relates. *Reserve, supra*, 30 Cal.3d at 807, 180 Cal.Rptr. 628, 640 P.2d 764. The purpose of this canon of construction is to protect the insured's reasonable expectation of coverage in a situation in which the insurer controls the language of the policy. *Id.; see also, Hanson v. Prudential Ins. Co. of America*, 783 F.2d 762, 765 (9th Cir.1985), citing *Reserve*. Its application differs depending upon the language to be interpreted. Coverage clauses are interpreted broadly so as to afford the greatest protection to the insured, while exclusion clauses are interpreted narrowly. *Id.; see also, Silberg v. California Life Ins. Co.*, 11 Cal.3d 452, 464–66, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974). Thus, in order to protect the reasonable and normal expectations of the insured, restrictions or exclusions in the policy must be clear and unambiguous.

When confronted with standardized provisions in a form insurance contract, *the primary focus of our inquiry is on the reasonable expectations of the insured at the time he purchased the coverage.* The ordinary expectation of one who purchases liability insurance is that he will be covered for *any liabilities incurred as a result of the activity to which the policy relates.* The insurance company's obligation to provide coverage can be limited only by exclusions phrased in language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided.

*Reserve* 30 Cal.App.3d at 809, 180 Cal.Rptr. 628, 640 P.2d 764 (emphasis added).

In this case, TBG was insured by Commercial Union under five different CGL policies during the relevant years—two primary policies, two umbrella policies, and one excess policy. The primary policies required Commercial Union:

To pay on behalf of the insured all sums which the insured shall become *legally obligated to pay as damages* because of injury to or destruction of property, including the loss of use thereof, caused by an [occurrence].[2] (Emphasis added.)

"Occurrence" is defined in the policy as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

The umbrella policies provided $5 million in coverage and obligated Commercial Union:

To indemnify the insured for all *sums which the insured shall be obligated to pay by reason of the liability imposed upon him by law* or liability assumed by him under contract or agreement for damages, and expenses, all as included in the definition of 'ultimate net loss,' because of:

.     .     .     .     .

(b) property damage, as hereinafter defined.... (Emphasis added.)

The term 'ultimate net loss' is defined in the umbrella policy as follows:

The term 'ultimate net loss' shall mean the total sum which the insured, or any company as his insurer, or both, becomes *legally obligated to pay as damages* because of personal injury, property damage ... and shall also include ... all sums paid as ... expenses for doctors, lawyers, nurses, and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder.... (Emphasis added.)

"Property damage" is defined by the policy as "(a) physical injury to, or physical destruction of, tangible property, including the loss of use thereof but excluding all other consequential damages, or (b) injury to or destruction of property, including the loss of use thereof, caused by accident." The excess policy contains essentially the same terms and definitions as the umbrella and primary policies. There is no exclusion in any of the policies for liability incurred as a result of pollution. In general terms, then, under the policies issued by Commercial Union during the relevant periods, TBG was entitled to indemnification for any damages incurred as a result of a legal obligation arising out of an occurrence that caused property damage.

The California Civil Code defines "damages" as compensation in money for detriment caused by an unlawful act or omission. Cal.Civil Code § 3281. Each of these elements—compensation, detriment, and an unlawful act—is present in this case. As a result of the action taken by the EPA on the MGM Brakes Site, TBG has been forced to pay the EPA over $900,000 in compensation for the EPA's investigation costs. Under the terms of the consent decree between TBG and the EPA, TBG will expend an additional $7 million to clean up the site. If TBG had refused to acknowledge its liability for the cleanup, the EPA could have performed the work itself

---

**2.** Originally, the policy provided coverage caused by "accident." The term "accident" was changed to "occurrence" pursuant to an endorsement to the policy.

and then sued TBG to recover the costs as "compensation therefor in money." *See,* 42 U.S.C. §§ 9606, 9607; Cal.Civil Code § 3281. TBG's expenditure of cleanup costs, therefore, is in the nature of compensation to the government and to the people of California for damage done to the environment.

The contamination of the MGM Brakes Site has also caused detriment to the property of others for which compensation is appropriate. The most obvious illustration of this is that the MGM Brakes Site includes not only property owned by TBG, but also four adjacent parcels of land owned by third parties. In addition, and of much more significance to the federal government and to the people of California, ground water and surface water running off the Site have been contaminated with PCBs. Air samples taken at the Site were also found to contain PCBs. These elements leave the Site contaminated with hazardous materials and enter the air and water supply of the state, thereby damaging property belonging to the State and the people of California. This concept is codified in California Water Code § 102, which provides that "[a]ll water within the State is the property of the people of the State, ..." Furthermore, the contamination of the MGM Brakes Site has not only damaged the property of the State and the people of California, but also has created an immediate and continuing public health threat, a detriment for which compensation is appropriate and which requires immediate remediation.

Finally, there has been an "unlawful act" which has caused the detriment. Although the release of the hazardous materials onto the property may not have been illegal at the time it occurred, that activity has now given rise to liability for significant damages under the CERCLA statute. The fact that CERCLA was not in existence at the time the contamination occurred, and that neither of the parties in this case could have anticipated liability arising under the statute, is irrelevant. TBG had a right to expect coverage for any unanticipated liabilities arising out of its insured activities. From TBG's perspective, damages incurred as a result of liability arising under CERCLA are no different than damages incurred as a result of any other legal action.

■■■ The Court recognizes that, in any particular case, an insurance company may be able to avoid coverage for environmental response costs by demonstrating that the particular terms of the policy preclude coverage. In some cases coverage may be precluded by an exclusion in the policy for property damage caused by pollution. Generally, however, absent such an exclusion, under the terms of a comprehensive general liability policy, an insured may reasonably expect to be covered for any liability arising out of insured activities that unintentionally causes environmental contamination. *See, Reserve, supra,* 30 Cal.3d at 809, 180 Cal.Rptr. 628. Because the terms of an insurance contract are to be construed broadly to protect the insured's reasonable expectation of coverage, the Court holds that environmental response costs incurred as a result of action taken by the EPA constitute "damages" within the meaning of a comprehensive general liability policy.

### B. *Other decisions.*

Although the California Supreme Court has not yet addressed this issue, this Court's holding is in accord with two other published decisions addressing this issue in the state of California.[3] *Intel Corp. v. Hartford Acc. and Indem. Co.,* 692 F.Supp. 1171 (N.D.Cal.1988), *appeal pending,* involved facts very similar to the facts in this case.[4] From 1968 through 1980,

---

**3.** There has also been a third decision published, *AIU v. Superior Court,* 213 Cal.App.3d 1219, 262 Cal.Rptr. 182 (1989), *review granted,* in which the Court of Appeal for the Sixth District decided this issue *contra.* As review has been granted in the case, it is without precedential value. For the reasons discussed herein, this Court respectfully disagrees with the court's analysis and conclusions in the *AIU* decision.

**4.** Because an appeal of this decision is currently pending before the Ninth Circuit, the Court did not rely upon its holding. This Court does, however, independently reach the same decision

Intel conducted manufacturing operations at a site in Santa Clara, California. During that time, the company used several toxic chemical solvents in its operations, and stored the chemicals in an unsecured underground storage tank. In 1981, it was discovered that the soil and underground water at the site were contaminated with the hazardous waste solvents. In 1985, Intel entered into a consent decree with the EPA for the remediation of the site. As in this case, Intel entered into the consent decree and agreed to clean up the site without admitting liability. Intel then submitted a claim to its insurance company under a comprehensive general liability insurance policy much like the policy at issue in this case. Hartford denied coverage on a number of grounds. Intel then filed suit against Hartford seeking a declaration of its rights under the policy.

In addressing the issue of whether environmental cleanup costs constituted "damages" within the terms of the CGL policy at issue in the case, the court began by reviewing and rejecting decisions from the Fourth and Eighth Circuits in which the courts held that CERCLA response costs are outside the scope of coverage under general liability policies. *See, The Maryland Casualty Co. v. Armco, Inc.,* 822 F.2d 1348 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Mraz v. Canadian Universal Ins. Co., Ltd.,* 804 F.2d 1325 (4th Cir.1986); and *Continental Ins. Co v. Northeastern Pharmaceutical & Chemical Co.,* 842 F.2d 977 (8th Cir.1988), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43. The court in *Intel* noted that, in the two Fourth Circuit decisions, *Maryland Casualty Co.* and *Mraz,* the Fourth Circuit had failed to apply state law to interpret the terms of the insurance policies at issue. In *Continental Ins. Co.,* the Eighth Circuit applied the state law of Missouri in its interpretation of the policies at issue.

Drawing on the rules of interpretation applicable to insurance policies in California, reviewed *supra,* and the definition of damages as set forth in California Civil

Code § 3281, *supra,* the court in *Intel* concluded that: "the California Supreme Court would hold that costs incurred by an insured in investigating and cleaning up pollution (in particular, hazardous waste) that is damaging public property and posing an established threat to public health are covered by the terms of a comprehensive general liability policy." *Id.* at 1192.

The holding in *Intel* was followed in an unpublished opinion in *Commercial Union Insurance Co v. Taxel,* Civil Action No. 87–336–S, slip op. (S.D.Cal. August 18, 1988). In an interpretation of insurance policies very similar to those at issue in this case, the court held as follows:

> It appears to this court that the reasonable expectation of an insured under the policy provisions at issue here is that the insured would be able to recover for all sums for which he became liable by reason of an occurrence, whether as damages in the technical sense or in the general sense, whether as costs of compliance with the law, and specifically with regard to clean-up costs. If the insurer desires a more restrictive limitation of damages or of the term 'property damage,' it can so provide to specifically exclude clean-up costs, such as those claimed by the insureds under the policies in this case.

*Commercial Union* at 10.

The second published opinion addressing this issue under California law is *Aerojet–General Corp. v. Superior Court,* 211 Cal. App.3d 216, 257 Cal.Rptr. 621 (1989), *rev. denied,* August 10, 1989. In *Aerojet,* the petitioners owned and operated a facility near Sacramento, California where rocket engines and components were manufactured. In 1979, it was discovered that the site was contaminated with toxic chemicals and that the contamination had spread to neighboring properties and seeped into the American River. The State of California sued Aerojet seeking to enjoin the company from causing further pollution and to recover its costs incurred in remedial work. Several years later, in 1986, the EPA also sued Aerojet under CERCLA alleging both

as did the court in *Intel* and, therefore, finds a        review of the case informative and instructive.

present and future damage to the environment and seeking both injunctive relief and response costs. Aerojet entered into a consent decree with both the EPA and the State of California whereby Aerojet agreed to clean up the site. Aerojet then sought to recoup its response costs under its comprehensive general liability insurance policy, which obligated the insurer "[t]o pay on behalf of the Insured all sums which the Insured shall become *legally obligated to pay as damages because of injury to or loss, destruction or loss of use of property." Aerojet* at 222, 257 Cal.Rptr. 621 (emphasis in original). The insurer denied coverage on the grounds that CERCLA response costs were in the nature of an equitable or restitutionary remedy and, therefore, not covered as legal damages incurred in an action at law.

Applying established principles of insurance policy interpretation, the California court of appeal rejected the insurer's argument.

Under a *Globe*[5] analysis, petitioners could reasonably expect that funds expended to correct third party property damage caused by pollution, and to mitigate the effects of that damage, are covered by their CGL policies. Their pollution has damaged the groundwater and river water of the state and federal governments; petitioners could reasonably believe that the governments' detriment would be recompensed by a payment of damages. (Cf. Civ.Code § 3281.) The fact that the damages do not take the form of a traditional damage award in an action at law is not determinative of the insureds' reasonable expectation of coverage.

Petitioners have become legally obligated to clean up their pollution by virtue of the polite but puissant compulsion of CERCLA. At least to the reasonable insured, this obligation is no less a legal sanction than that of a monetary judgment. Indeed, having purchased insurance to cover them for damages because of property damage, petitioners would be

surprised indeed to learn that coverage depended on whether the proceeding employed to obtain recompense was defined as 'legal' or 'equitable.' An insured reading the coverage clause before us would reasonably conclude it provided coverage for any economic outlay compelled by law to rectify and mitigate property damage caused by the insured's pollution.

*Aerojet,* 211 Cal.App.3d at 227–228, 257 Cal.Rptr. 621.

As the courts in both the *Intel* and *Aerojet* decisions emphasized, the key issue in determining whether environmental response costs are insured under a general liability policy is the terms of the insurance policy itself and the reasonable expectations of the insured as to meaning of those terms. The terms of the policies issued to TBG by Commercial Union in this case provide coverage for any expenses TBG becomes legally obligated to pay as damages for property damage. TBG could reasonably expect that response costs incurred as a result of liability imposed under CERCLA would fall into the area of coverage.

### C. *Nature of the Damage and the Remedy.*

In reaching this decision, the Court specifically rejects Commercial Union's argument that coverage is precluded because the PCBs on the MGM Brake Site have not yet caused any "damage." The contamination of property with toxic materials causes immediate and tangible damage to the water and air supply of the state, which is the property of the public, Cal.Water Code § 102, and poses an immediate and continuing threat to the public welfare. As the court in *Aerojet* held, "[u]nquestionably, the state and federal governments are third party property owners for purposes of insurance coverage. Pollution of the ground and river waters is damage to public property, as well as a direct injury to public welfare." *Aerojet, supra,* 211 Cal. App.3d at 229, 257 Cal.Rptr. 621.

---

**5.** The case referred to is *Globe Indem. Co. v. State of California,* 43 Cal.App.3d 745, 118 Cal. Rptr. 75 (1974), in which the court held that

expenses incurred in mitigating property damage are covered as damages under a general liability policy.

The Court also rejects Commercial Union's argument that coverage is precluded because liability arising under CERCLA is restitutionary or equitable in nature and, therefore, not recoverable as "damages" under traditional insurance law. CERCLA is a unique statute, which creates liabilities and remedies containing elements of both an equitable and a legal nature. For example, the federal government is empowered under the statute to compel private parties to remedy hazardous waste contamination. 42 U.S.C. § 9606. Such an action seeks injunctive relief and, therefore, may be considered "equitable" in nature. The government is also empowered, however, to perform the remedial work itself and seek compensation later. 42 U.S.C. § 9607(a)(4)(A). In these cases, the action is more "legal" in nature because the remedy sought is monetary compensation. The statute also authorizes one private party, who has been compelled to clean up a contaminated site, to sue another private party for the costs incurred in the cleanup. 42 U.S.C. § 9607(a)(4)(B). Actions of this nature, to which the government is not even a party, seek only monetary damages and are clearly "legal" in nature. Finally, sections 107(a)(4)(C) and (f) authorize the United States or any state to sue a responsible party under the statute for injury to or destruction of natural resources belonging to the federal government, a state, or an Indian tribe. Such an action seeks monetary compensation for property damage, just like any other action at law for damages.[6] The issue of whether CERCLA is primarily legal or equitable in nature, therefore, does not lend itself to a defini-

tive answer. As the court pointed out in *Aerojet*, however, the nature of liability under CERCLA, whether it be equitable or legal, is essentially irrelevant to the critical measure of coverage under a CGL policy, that being the reasonable expectation of the insured.

> Especially where, as here, the insured does not simply reimburse the government for its response costs, but incurs a direct out-of-pocket economic detriment for the response costs in the first instance, *the question is not whether the action or the relief sought is equitable or legal, but whether the insured has a reasonable expectation that such costs are insured* as 'damages because of injury to or loss, destruction or loss of use of property.'

*Aerojet* at 230, 257 Cal.Rptr. 621 (emphasis added). This Court concludes that TBG did have a reasonable expectation that any liability arising out its activities on the MGM Brakes Site would be insured under the CGL policies issued by Commercial Union. Accordingly, the Court holds that the response costs incurred by TBG in cleaning up the Site are "damages" within the scope of Commercial Union's coverage.

## II. "Trigger" Issue.

The second issue before the Court is whether, and under what theory, coverage under the insurance policies for the contamination of the MGM Site was triggered. The parties have suggested three different possibilities: an "exposure" theory, a "continuous trigger" theory, and a "manifesta-

---

**6.** Commercial Union argues that, because the EPA action against TBG in this case only sought recovery under Section 107(a)(4)(B) for response costs, and not compensation for damage to natural resources under Section 107(a)(4)(C), there has been no "damage" to property for which TBG may seek coverage. The Court find this argument to be without merit. The EPA undoubtedly has its own policies for determining when it is appropriate to seek recovery for response costs and when it is appropriate to seek compensation for damage to natural resources. It is not for this Court to second-guess the motives of the EPA in making this determination. The Court would postulate, however, that suits for compensation for damage to natu-

ral resources may be necessary in those situations in which the contamination of the environment *cannot* be cleaned up or otherwise remedied or in which the property damaged has particular significance as a natural resource, such as an important waterway, a section of coastline, a national forest, a state park, etc. Regardless of whether the EPA sues for response costs or for damage to natural resources, however, the scope of coverage under a general liability policy depends upon the insured's reasonable expectation coverage. That expectation is not likely to be dependent upon the particular section of the CERCLA statute under which relief is sought.

tion" theory.[7] Under an "exposure" theory of coverage, a liability policy is triggered whenever there is exposure to an injury- or damage-causing agent during the policy period. *See, e.g., Hancock Laboratories, Inc. v. Admiral Ins.*, 777 F.2d 520, 524–525 (9th Cir.1985); *Clemco Indus. v. Commercial Union Ins. Co.*, 665 F.Supp. 816, 827–828 (N.D.Cal.1987), *aff'd* 848 F.2d 1242 (9th Cir. 1988); *Beckman Instruments, Inc. v. International Insurance Co.*, Civ. Action No. 85–8382 MRP, slip op. (C.D.Cal. January 27, 1988). Under a "continuous trigger" theory of coverage, all insurance policies in effect from the date of initial exposure to a damage-causing agent, through any period of progressive or continuous damage, up to the time the damage is discovered, are triggered. In *California Union Ins. Co. v. Landmark Ins. Co.*, 145 Cal.App.3d 462, 476, 193 Cal.Rptr. 461 (1983), for example, the property damage had been caused by the leaking of a swimming pool over a period of two years. The court held that because the damage had been continuous and progressive, both the insurance policy in effect when the leaking began, and the policy in effect when it became apparent, were triggered. Finally, under a "manifestation" theory of coverage, which Commercial Union urges this Court to adopt, coverage is triggered at the time the damage to the property becomes apparent. *See, e.g., Remmer v. Glens Falls Indemnity Co.*, 140 Cal.App.2d 84, 295 P.2d 19 (1956); *Home Insurance Co. v. Landmark Insurance Co.*, 205 Cal.App.3d 1388, 253 Cal.Rptr. 277 (1988).

A review the cases that have addressed the trigger issue under California law leads this Court to the conclusion that there is no single theory of trigger universally applicable in CGL policies for property damage. Rather, courts determine the appropriate theory of trigger based on an examination of the terms of the policy and the nature of the damage. The five insurance policies under which TBG seeks coverage for its cleanup costs on the MGM Brakes Site are discussed and quoted above in the discussion of damages. Generally, the policies require Commercial Union to pay on behalf of TBG "all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence." An occurrence is generally defined by the policies as "an accident, including injurious exposure to conditions, which results, *during the policy period*, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Emphasis added). The policies are what is known as "occurrence" policies, rather than "claims made" policies. In other words, coverage is provided for *occurrences* that cause damage during the policy period, rather than for *claims* made during the policy period. There is no requirement under the terms of the policies that *liability* for the property damage arise during the policy period. The critical issue then, in deciding whether coverage under the policies was triggered, is determining whether there was an occurrence that caused property damage during the policy period.[8]

In answering this question, the Court holds that the most appropriate theory for determining whether coverage was trig-

---

**7.** TBG suggested an additional theory, termed the "injury-in-fact" theory of trigger, that has been applied in some jurisdictions to determine when coverage is triggered in environmental contamination cases. Courts applying this theory have held that coverage is triggered each time pollutants are released onto the site. *See, e.g., Centennial Ins. Co. v. Lumbermens Mut. Casualty Co.*, 677 F.Supp. 342, 346–347 (E.D.Pa.1987), (coverage triggered upon each release of pollutants onto the site); *Upjohn Co. v. New Hampshire Ins. Co.*, 178 Mich.App. 706, 444 N.W.2d 813, 820 (1989), (groundwater damage occurred when the hazardous substances were released); *see also, Continental Insurance Companies v.*

*Northeastern Pharmaceutical and Chemical, Co., Inc.*, 811 F.2d 1180, 1189 (8th Cir.1987), *reh'g granted* 815 F.2d 51 (8th Cir.1987). The Court finds this theory of coverage indistinguishable in practical effect from the "exposure" theory of coverage and does not address it separately.

**8.** Other courts have also addressed the trigger issue as primarily one of interpreting the "occurrence" requirement. *See, e.g., California Union Ins. Co. v. Landmark Ins. Co.*, 145 Cal. App.3d 462, 476, 193 Cal.Rptr. 461 (1983); *Beckman Instruments, Inc. v. International Insurance Co.*, Civ. Action No. 85–8382 MRP, slip op. (C.D.Cal. January 27, 1988).

gered in this case is the "exposure" theory. The event that caused the property damage, giving rise to TBG's liability under CERCLA, was the release of materials containing PCBs onto the site. Each time such a release occurred, the property was immediately damaged. Thus, coverage under the policies issued by Commercial Union was triggered each and every time materials containing PCBs were released onto the MGM Brakes Site.

The continuous trigger theory of coverage would be inappropriate in this case because it would require coverage from every insurer of the property from the time the contamination occurred in the late 1960s until the time it was discovered in the early 1980s, despite the fact that, after 1972, there were no new occurrences causing property damage. The Court also rejects the manifestation theory of trigger as inconsistent with the terms of the policies. The policies provide coverage for property damage that *occurs* during the policy period, not for property damage that is *discovered* during the policy period.

In its motion for partial summary adjudication of this issue, TBG has also asked this Court to rule, as a matter of law, that specific policies issued by Commercial Union during the relevant years *have been triggered.* The Court declines to do so at this time. While the appropriate theory of trigger may be determined as a matter of law, a determination of whether the policies have, in fact, been triggered requires resolution of a number of factual issues. Although the EPA compiled an extensive record on the MGM Brakes Site, Commercial Union has not yet had an opportunity to conduct its own discovery for purposes of this litigation. Accordingly, the Court finds that a determination of which, if any, of Commercial Union's policies issued to TBG have been triggered is premature.

III. Allocation Issue.

In its third motion for partial summary adjudication, TBG has asked this Court to determine whether it may, at its election, assign its costs incurred in the cleanup of the MGM Brakes Site to particular policies and policy years. For the reasons stated at the hearing on this matter, the Court finds that such a determination requires a factual basis and, therefore, is premature at this stage of the proceedings. Accordingly, this motion is denied without prejudice.

### CONCLUSION

For the reasons discussed above, the Court hereby makes the following orders:

1. TBG's motion for partial summary adjudication as to the "damages" issue is GRANTED as follows: The Court holds that the environmental response costs incurred by TBG in the investigation and remediation of the hazardous waste contamination on the MGM Brakes Site constitute "damages" within the meaning of the comprehensive general liability policies issued by Commercial Union.

2. TBG's motion for partial summary adjudication as to the "trigger" issue is GRANTED as follows: The Court holds that the appropriate theory for determining whether coverage was triggered in this case is the "exposure" theory. The Court declines, however, to rule that specific policies have been triggered.

3. TBG's motion for partial summary adjudication as to its right to allocate its expenses to particular policies and policy years is DENIED WITHOUT PREJUDICE.

SO ORDERED.