[Civ. No. 39650. First Dist., Div. Two. Aug. 25, 1977.]

RICHARD F. CHAMBERLIN et al., Plaintiffs, v.
MILO WHITNEY SMITH et al., Defendants;
RESERVE INSURANCE COMPANY et al.,
Interveners and Respondents;
MISSION INSURANCE COMPANY, Intervener and Appellant.

838

COUNSEL

Ray C. Bennett, Howard M. Fields and Bennett & Fields for Intervener and Appellant.

Boornazian, King & Schulze, David J. Garthe, Bronson, Bronson & McKinnon, Samuel D. Davis and David W. Gordon for Interveners and Respondents.

## OPINION

CHAPMAN (R. D.), J.*—We are asked, in this appeal, to decide which of three insurance companies must bear a loss occasioned by a claim of negligence on the part of an attorney.

We need not decide whether the attorney was in fact negligent, because the insurance companies have settled the claim.

Richard and Barbara Chamberlin (hereinafter Chamberlins) and Harold E. Paul and Harold E. Paul, Jr. (hereinafter Pauls) were the principal stockholders of Larraburu Brothers, Inc. (hereinafter the corporation). The Pauls desired to acquire control of the Chamberlins' stock. The parties agreed on a purchase price of $500,000. An attorney, Milo Whitney Smith (hereinafter Smith), was employed to structure the transaction and draw up the necessary papers.[1]

In structuring the transaction it became desirable to have the corporation redeem as much of the Chamberlins' stock as possible to reduce tax consequences. Whether the corporation redeemed the stock or the stock was purchased directly by the Pauls, the end result would be the same, Pauls would acquire complete control of the corporation.

The amount of stock a corporation is permitted to redeem is limited to the amount of earned surplus on hand.[2] On November 13, 1968, Smith sent a letter to the Division of Corporations requesting a permit to allow the corporation to redeem one-half of the Chamberlins' shares for $250,000, enclosing a financial statement for 1967 showing an earned surplus of $288,465.

---

*Assigned by the Chairperson of the Judicial Council.

[1]Most of the actual work was done by Kenneth A. Granberg, a young attorney in the Smith firm.

[2]Former section 1707 of the Corporations Code provided that a corporation could purchase its own stock only out of earned surplus. Exceptions provided in other code sections do not apply here.

Written consent of the Division of Corporations was given on December 12, 1968. Based on this consent, on December 17, 1968, the parties executed agreements whereby the corporation purchased one-half of the Chamberlins' stock for $250,000, the purchase price to be paid by December 31, 1968, and the Pauls purchased the remaining one-half for an additional $250,000.

In point of fact the December 17, 1968, agreements were unenforceable because a new financial statement, issued November 6, 1968, showed an earned surplus of only $230,567. Because of the posture in which this case is presented, we must take it that the parties were induced to enter into an unenforceable agreement because of the negligence of Smith in relying upon an outdated financial statement.

On December 17, 1968, the Smith law firm was covered by an errors and omissions policy issued by Mission Insurance Company (hereinafter Mission). The Mission policy expired December 27, 1968, at which time CNA Insurance Company (hereinafter CNA) issued its errors and omissions policy covering the Smith firm. The CNA policy expired December 27, 1969, at which time Reserve Insurance Company (hereinafter Reserve) issued an errors and omissions policy covering the Smith firm.

After December 17, 1968, various efforts were made by the corporation, and by the Pauls, individually and on behalf of the corporation, to complete the purchase of the Chamberlins' stock, until January 12, 1971, when the corporation filed a chapter 11 proceeding. As a result of being unable to enforce the sales agreement, the Chamberlins suffered a loss of $90,000.[3]

On December 17, 1970, Chamberlins filed a lawsuit against various parties, including a cause of action against Smith, alleging negligence and asking damages in the amount of $90,000, plus interest.

Reserve undertook the defense of Smith under a reservation of rights and expended approximately $14,000 in investigation, defense and other costs. The lawsuit was settled for $30,000. Each of the three insurance companies contributed monies to the settlement reserving the right to litigate their liabilities.

---

[3]Eventually, the corporation was able to work out a voluntary plan with its creditors and the chapter 11 proceeding was dropped, but not until after Chamberlins had waived their $90,000 claim.

On April 7, 1975, Reserve filed a suit in intervention naming CNA and Mission as party interveners, asking that CNA or Mission be declared responsible for the loss, and for the costs incurred in defending Smith, and for a declaration of the rights and duties of the three insurance companies under their respective policies.

The trial court found the responsibility for the loss was entirely upon Mission and gave a judgment in favor of both Reserve and CNA that provided for reimbursement of their settlement payments and costs of defense.

Mission appeals that judgment.

*When the Negligent Act Occurred.*

■ At the outset, it is necessary to determine when the negligence occurred.

The trial court found that the negligent act which caused the loss occurred on or before December 17, 1968, the date the stock redemption and purchase agreement prepared by Smith was executed. The court held that Smith, who was an attorney and a director of the corporation, was or should have been aware that the earned surplus of the corporation was insufficient to allow the purchase, because on November 6, 1968, the firm of Muncy, McPherson & Co. transmitted to the corporation the 1968 financial statement showing an earned surplus for the year ending September 18, 1968, of $230,567.[4] This finding is supported by the record.

Mission argues that as the attorney for the parties, Smith was under a continuing duty to ascertain the true facts concerning the earned surplus of the corporation, and upon learning the truth to suggest a rescission and a restructuring of the original transaction to provide that the corporation purchase no more than $220,000 of Chamberlins' stock, increasing the amount that Pauls would pay to $280,000. In this way, the Chamberlins would still receive a total of $500,000 for their stock as before, and the Pauls would become the sole stockholder, as planned.

---

[4]The corporation's internal audit, dated November 23, 1968, showed an earned surplus of $223,378 which was $7,189 less than the figure provided by the accountants Muncy, McPherson & Co. In addition, on December 21, 1968, four days after the execution of the agreement, the earned surplus had slipped to $213,843.

If this argument is accepted, the neglect of Smith would continue into the periods covered by CNA and Reserve.

The argument is, however, unacceptable. It is entirely speculative. As pointed out by the respondent Reserve, the fatal flaw in the argument is that it assumes the Pauls and the corporation would be willing to enter into a new transaction at the original price at a time when the earned surplus was steadily diminishing and the corporation was losing $3,000 per month.

Mission relies upon *Heyer* v. *Flaig* (1969) 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161], wherein the California Supreme Court considered whether the statute of limitations bars an action for legal malpractice in the drafting of a will prepared over two years before the action was brought. The court held that the statute of limitations did not start to run from the time the will was drafted but "from the date that the cause of action accrues: namely, the incidence of the testatrix' death when the negligent failure to perfect the requested testamentary scheme becomes irremediable and the impact of the injury occurs." (*Id.*, at p. 225.) The court reasoned: "As to the plaintiffs' interests, defendant's action in negligently drafting the will and his omission in negligently failing to correct his error before the testatrix' death caused equally damaging consequences. Defendant owed a duty of care to the plaintiffs to effectuate in a nonnegligent manner the testamentary scheme of the testatrix. Such a duty may extend beyond the date of the original drafting of the will when the attorney's negligent acts created a defective estate plan upon which the client might rely until her death. The duty effectively to fulfill the desired testamentary scheme continued until the testatrix' death, when the testatrix' reliance became irrevocable. Because defendant owed plaintiffs this continuing duty the cause of action did not accrue nor the statute of limitations commence to run until the defendant's negligence became irremediable." (*Id.*, at p. 230.)

Mission argues that during the period of CNA's policy, Smith had a continuing duty to advise his clients that the stock redemption transaction was void, and that the damage to the Chamberlins did not become irremediable until May of 1970 because until that date the transaction could be modified or rescinded. CNA contends that the negligence of Smith was irremediable once the agreement was executed on December 17, 1968, as nothing thereafter could have been done to make the agreement valid or enforceable.

It should be noted that the court in *Heyer* is concerned with the statute of limitations. But more importantly in *Heyer* if the attorney had corrected the will to reflect the desired testamentary scheme, no damage would have been sustained by the heirs. That is, the heirs in *Heyer* suffered no damage until the testatrix died because the testatrix could have altered her will at any time, therefore, the cause of action as to the heirs did not accrue until the death of the testatrix. The court pointed out that as to the testatrix the cause of action for malpractice occurred at the time the will was executed, however, the damages as to her would be slight because she had the unilateral power to create a new and effective will. (*Id.,* at p. 232.) In our case as to the Chamberlins the damage was irremediable as of the date the agreement of sale was executed, because thereafter they did not have the power to unilaterally create a new and effective contract of sale.

*Liability of Mission.*

■ The following language in the policy issued by Mission is pertinent to the instant case: "THIS INSURANCE is to indemnify . . . against any *claim or claims* for breach of professional duty as Lawyers *which may be made against them* during the period set forth in the Certificate by reason of any negligent act, error or omission, whenever or wherever the same was or may have been committed. . . .

". . . . . . . . . . . . . . . . .

"If during the subsistence hereof the Firm shall become aware of any occurrence *which may subsequently give rise to a claim against them* for breach of professional duty as Lawyers by reason of any negligent act, error or omission and shall during the subsistence hereof give written notice to the Underwriters of such occurrence, then any such claim which may subsequently be made against the Firm arising out of that negligent act, error or omission shall for the purposes of this Insurance be deemed to have been made during the subsistence hereof." (Italics added.)

This exact language, with the same emphasis, was construed by the California Supreme Court in *Gyler* v. *Mission Ins. Co.* (1973) 10 Cal.3d 216 [110 Cal.Rptr. 139, 514 P.2d 1219]. The court held that the use of the word " 'may' " in conjunction with the phrase " 'claims made' " rendered the policy subject to two possible constructions which ambiguity could have been avoided if the policy had employed the more accepted

phrase " 'claims made' " without using the term " 'may' " in conjunction therewith.

"First, the phrase might limit coverage to a claim asserted within the policy period and exclude claims asserted afterward, making the words 'which may be' superfluous. Secondly, the phrase might be construed as extending coverage to any claim which arose and *could* have been asserted during the policy period, including claims not actually asserted until after the policy's expiration." (*Id.,* at p. 219.)

The *Gyler* court chose the second interpretation so that the policy afforded coverage in two circumstances: (1) when a claim is made within the policy period, and (2) when the date of injury is within the policy period, regardless of when the claim is made. The court reasoned that the reasonable expectation, which should determine the meaning of an insurance policy of an insured attorney, would be that the phrase " 'claim' " which may be made would mean " 'cause of action' " or " 'right' " opposed to the restricted meaning of " 'assertion of a right.' " (*Id.,* at pp. 219-220.) The court stated that this interpretation supplements the second paragraph rather than contradicts it. The second paragraph provides coverage when an act has occurred and the attorney has given the insurer notice thereof but injury occurs after expiration of the policy period.

Mission argues that the holding in *Gyler* is only appropriate to disputes between an insurance company and an insured person, because it protects the expectation of the insured person. It argues that a different construction should be given where the dispute is between insurance companies. It suggests that in the latter case the principle that insurance contracts must be construed against the insurer is inapplicable. (*Argonaut Ins. Co.* v. *Transport Indem. Co.* (1972) 6 Cal.3d 496, 506 [99 Cal.Rptr. 619, 492 P.2d 673].)

■ The general rule is that if coverage is available under any reasonable interpretation of an ambiguous clause of an insurance policy, the insurer cannot escape its obligations. (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801, 57 A.L.R.2d 914]; *Farmers Ins. Exch.* v. *Harmon* (1974) 42 Cal.App.3d 805, 807 [117 Cal.Rptr. 117].) ■ In order to have uniformity in the interpretation of insurance contracts, this court, in determining whether a particular policy provides coverage, must consider the policy alone as if no other insurance is available. (*Hartford Accident & Indem. Co.* v. *Civil Service*

*Employees Ins. Co.* (1973) 33 Cal.App.3d 26, 31 [108 Cal.Rptr. 737].) To do otherwise would lead to even more confusing decisions in the area of interpretation of insurance contracts. .

*Liability of CNA.*

■  CNA's policy provides the following coverage: "This policy applies to acts or omissions within the United States of America, its territories or possessions or Canada (a) during the policy period or (b) prior to the policy period if claim is made or suit is brought against the insured during the policy period and such insured at the effective date of the insurance did not know or could not have reasonably foreseen that such acts or omissions might be expected to be the basis of a claim or suit. . . ."

CNA can be held liable only if the negligence of Smith continued past December 17, 1968, and into 1969, when the CNA policy was in force. We have found this contention to be speculative, and that in the case at bar the negligence occurred on or before December 17, 1968, and became irremediable as of that date. The cause of action for professional negligence accrued on that date.

The case of *Arant* v. *Signal Ins. Co.* (1977) 67 Cal.App.3d 514 [136 Cal.Rptr. 689], is very much in point. In *Arant* the attorney's law firm seeking an errors and omissions policy made an affirmative decision not to purchase " 'prior acts' " coverage.[5] The terms of the policy expressly excluded from coverage "acts committed prior to the beginning of the policy period."

In *Arant* the negligence consisted of advice given in September 1962 and then reiterated on several occasions until 1967. The adverse impact of this advice was not experienced until it was retracted in September 1972. The Signal Insurance Company coverage did not commence until 1971.

The *Arant* court held: "The injury, or harm, in this case was done when the advice, later retracted as erroneous, was given concerning the

---

[5]The two most common types of insurance policies offered for professional malpractice are the "claims made" (or "discovery") policy and the "occurrence" policy. A "claims made" policy is one whereby the carrier agrees to assume liability for any errors, including those made prior to the inception of the policy as long as a claim is made during the policy period. On the other hand, an "occurrence" policy provides coverage for any acts or omissions that arise during the policy period even though the claim is made after the policy has expired.

scope of Held's contract with Nova-Tech. Held, it is true, did not suffer damages until after the advice was given and professional liability insurance, as noted by the Supreme Court, indemnifies the insured against the consequences of the negligent act. (*Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A. G.* (1970) 3 Cal.3d 434, 446 [91 Cal.Rptr. 6, 476 P.2d 406].) Nevertheless, the policy cannot be extended to indemnify against the consequences of an act when the act itself took place beyond the limits of the policy period. The operation, or coverage, of the policy at bench is predicated on 'any act, error or omission' of the insured. The assertedly negligent advice upon which Arant's liability to Held is predicated was rendered in 1962-67, prior to the commencement of the policy period, and Signal was therefore not required to defend and indemnify Arant." (*Id.,* at pp. 517-518.)

The court repeated the general rule: "It is settled that the time of the *occurrence* of an accident within the meaning of an indemnity policy is the time that the damages insured against actually accrue. (*Tijsseling* v. *General Acc. etc. Assur. Corp.* (1976) 55 Cal.App.3d 623, 626 [127 Cal.Rptr. 681].)

"     .     .     .     .     .     .     .     .     .     .     .     .     .     .     .     .     .     .

" 'The statute of limitations, as it applies to actions . . . establishes the time at which a cause of action accrues. It does not fix the time at which the injury giving rise to the cause of action accrued.' (*Tijsseling* v. *General Acc. etc. Assur. Corp., supra,* 55 Cal.App.3d 623, 628.)" (*Id.,* at pp. 516-517.)

In the present case, the CNA policy is broader than the policy in *Arant,* in that it covers acts or omissions occurring prior to the policy period, but only where the "claim is made or suit is brought against the insured during the policy period." In fact the claim was not made until after the policy period.

The policy contained an additional qualification as to acts or omissions prior to the effective date of the policy, i.e., that the insured "did not know and could not have reasonably foreseen that such acts or omissions might be expected to be the basis of a claim or suit." In view of our holding that the negligence was prior to the CNA policy, and the claim was not made until after the policy expired, it is unnecessary to decide whether Smith knew or could reasonably foresee that his negligence in using the wrong financial statement might be expected to be the basis of a claim or suit.

■ Mission also relies on *Budd* v. *Nixen* (1971) 6 Cal.3d 195 [98 Cal.Rptr. 849, 491 P.2d 433], for the proposition that an action for legal malpractice does not accrue until a client has suffered appreciable harm. However, given the holding in *Arant,* it appears that the time of accrual of a cause of action for purposes of the statute of limitations is not the proper criteria to apply when considering when an "act, error or omission" occurred for the purposes of an insurance policy.

*Liability of Reserve.*

■ Reserve's policy contains the following limitation on its coverage: "This policy applies only to acts, errors or omissions which occur within the United States of America, its territories or possessions, or Canada (a) during the policy period and then only if claim is made during the period, or (b) which occurred prior to the effective date of the policy, and then only if such claim is made during the policy period provided (1) no insured or any employee had any knowledge of such prior negligent act, error, mistake or omission at the effective date of the period, and (2) there is no other insurance applicable to such act, error, or omission, and (3) the legal liability does not arise out of the responsibility of the insured as a member of any partnership, except a predecessor in business which advised and/or represented substantially the same clients advised and/or represented by the named insured. Nothing herein contained shall operate to increase the limit of the company's liability."

While the negligent act did not occur during the policy period, the claim was made while the Reserve policy was in force. We must therefore determine whether all conditions for such coverage are met. The applicable conditions are "(1) no insured or any employee had any knowledge of such prior negligent act, error, mistake or omission at the effective date of the period, and (2) there is no other insurance applicable to such act, error or omission."

It would appear fairly obvious, that by December 27, 1969, the effective date of the Reserve policy Smith knew of his mistake, and that the agreement of the corporation to buy the stock was unenforceable.[6]

---

[6]Appellant did not request findings of fact or conclusions of law. The trial court wrote an "opinion" but did not discuss its findings as to when Smith became aware of his mistake. However, it would seem that it had to have been well before December 27, 1969. Smith was not only the attorney for the corporation, he was also a director. Reserve has referred to a letter (Exhibit N) from Smith to Paul, Sr., from which the inference may be drawn that Smith had knowledge of his error.

In *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427 [45 P.2d 183], the court stated as a fundamental doctrine that "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible."[7] (*Id.,* at p. 429.)

Since the insured (Smith) had knowledge of his mistake, the Reserve policy did not cover the negligence which occurred prior to the effective date of the policy. Moreover, the second condition of the Reserve policy was not met in that there was, in fact, "other insurance applicable to such act, error or omission," to wit, the Mission policy.

Mission argues that the "other insurance" clause in the Reserve policy is an escape clause, and that since the Mission policy also has an "other insurance" escape clause, the liability for any acts or omissions by the insured must be divided between Reserve and Mission.

■ An escape clause is one that provides for avoidance of liability when there is other valid insurance. (*Underground Constr. Co.* v. *Pacific Indemnity Co.* (1975) 49 Cal.App.3d 62, 67 [122 Cal.Rptr. 330].) "The applicable principle appears to be that 'escape' clauses are not favored in the law and that, where they are in conflict with the 'other insurance' clause in another policy covering the same risk with the result that if both clauses are given validity the insured is left unprotected, the 'escape' clause will be disregarded and the 'other insurance' clauses in both policies will be given effect on a basis of applicable proration. [Citations.] As long as the insured is protected and financial responsibility is provided for the protection of the public an 'escape' clause is not contrary to public policy or the law. [Citation.]" (*Id.,* at p. 68.)

■ The foregoing doctrine should be applied with caution in the case of successive attorney malpractice insurance policies where the error or omission occurs during the life of one policy, and the claim is made during the life of another. Attorney malpractice insurance policies are somewhat unique. Ordinarily an insurance policy will only cover liability for an occurrence during a period covered by the insurance. Attorney malpractice insurance will often contain a "claims made" clause which will cover the insured for all claims made during the life of the policy

[7]This fundamental doctrine is stated and applied in hundreds of cases. (See 6 Witkin, Cal. Procedure (2d ed. 1971) § 245, pp. 4236-4238, for examples.)

regardless of when the error or omission occurred. In *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434 [91 Cal.Rptr. 6, 476 P.2d 406], the court notes a distinction between an indemnity against liability and an indemnity against loss, stating that "in the former the essence of the contract is that the event shall not happen while in the latter the indemnity is against the consequences of the event if it should happen." (*Id.,* at p. 446.)

A careful study and comparison of the Mission and the Reserve policies dramatically reveals the inapplicability of *Underground Constr. Co.* v. *Pacific Indemnity Co., supra,* to the instant case.

The format of the Mission policy is in two parts. Part one contains the insuring agreement (labeled "ATTORNEYS' INDEMNITY"), and part two the conditions thereof. The Reserve policy is in three parts. Part one contains the insuring agreement, part two the exclusions and part three the conditions. In the conditions part both have other insurance clauses. In Mission, it is the following condition: "5. There shall be no liability hereunder in respect of any claim for which the Firm is entitled to any indemnity under any other insurance." The Reserve policy contains the following condition: "6) Other Insurance [¶] If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, with respect to acts or omissions which occur prior to the policy period, the insurance hereunder shall apply only as excess insurance over any other valid and collectible insurance and shall then apply only in the amount by which the applicable limit of liability of this policy exceeds the sum of the applicable limits of liability of all such other insurance."

Most important, there is a separate clause relating to other insurance in the insuring agreements part of the Reserve policy. After declaring that the policy covers acts, errors or omissions during the policy period, paragraph IV then expressly states that the policy will cover acts, errors or omissions prior to the effective date of the policy, but only if "there is no other insurance applicable to such *act, error or omission.*" (Italics added.) We note that condition 6 expressly provides that as to acts, errors or omissions which occur prior to the policy period, the insurance coverage shall apply only as excess insurance.

The "Other Insurance" clause in the "CONDITIONS" part of the Mission policy appears to be an escape clause within the meaning of *Underground Constr. Co.* v. *Pacific Indemnity Co., supra.* The "Other Insurance" clause in the "CONDITIONS" part of the Reserve policy, while not an escape clause, is a composite pro rata-excess clause. The purpose of the two clauses, each in a different way, is to limit liability in the event there is other insurance coverage for a loss covered by the policy. However, the deliberate statement in the "INSURING AGREEMENTS" part of the Reserve policy that there will be no coverage for an act, error or omission that occurred prior to the effective date of the policy if there is other insurance is not an escape clause, it is an exception from coverage. Moreover, it is reasonable not to provide coverage where the act, error or omission occurred during the life of an earlier policy. After all, Reserve could have provided no coverage at all for acts, errors or omissions occurring prior to the effective date of its policy. As pointed out in *Siegman* v. *Orion Ins. Co.* (1971) 16 Cal.App.3d 533, 536 [94 Cal.Rptr. 80], the interpretation to be given words may depend on the use of the words in the instrument where they appear.

Thus, it appears that Reserve's policy affords no coverage for acts or omissions that occurred prior to its policy period if there is other insurance. However, if other insurance does not completely cover the insured's liability, then Reserve's policy provides excess coverage. If acts or omissions occur during the policy period and a claim is also made during the policy period and there is other insurance available, the loss will be prorated between Reserve and the other insurance company.

It is well recognized that an insurance company has an unquestionable right to limit the coverage of the policy issued by it; and, when it has done so, the plain language of the limitation must be respected. (*Argonaut Ins. Co.* v. *Transport Indem. Co., supra,* 6 Cal.3d 496, 508; *Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* 46 Cal.2d 423, 432; *Pacific Indem. Co.* v. *Truck Ins. Exch.* (1969) 269 Cal.App.2d 420, 428-429 [74 Cal.Rptr. 793].) When the noncoverage clause appears in clear and conspicuous terms in the policy, it must be given effect.

It is our conclusion: (1) that the error or omission of Smith occurred during the period he was insured by Mission; (2) that the Mission insurance policy covered the loss even though the claim was not made until after the policy expired; and (3) that there was no other insurance to cover the *claim* or the *loss.* Therefore, Mission must bear the

entire loss including costs expended by Reserve defending Smith under a reservation of rights.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 27, 1977.