Filed 5/10/16 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ARCH SPECIALTY INSURANCE COMPANY,<br><br>Defendant and Respondent. | C072500<br><br>(Super. Ct. No. 34-2010-00093381-CU-IC-GDS)<br><br>MODIFICATION OF OPINION UPON DENIAL OF REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

The opinion filed on April 11, 2016, is modified as follows:

1. On page 2 of the slip opinion, delete from lines 20 and 21 "that Underwriters is entitled to equitable contribution. On remand, the trial court will determine the amount" and insert:

> that Arch's "other insurance" clauses are unenforceable to relieve Arch of a duty to defend in this equitable contribution case

2. On page 7 of the slip opinion, delete the third and fourth full paragraphs and insert:

> Underwriters filed a motion for summary adjudication that Arch's "other insurance" provisions are unenforceable to relieve it of its duty to defend, thus eliminating that affirmative defense.

1

Arch moved for summary judgment or summary adjudication, arguing its "other insurance" provisions relieved it of any duty to defend, and it had no duty to defend the additional insured under the additional insured endorsement.

3. On page 8, at the end of the sentence on line 6, insert:

The trial court did not need to decide Arch's separate argument that it had no duty to defend the additional insured.

4. On page 20 of the slip opinion, line 6, delete "We conclude Underwriters is entitled to receive equitable contribution from Arch" and insert:

We conclude Arch's "other insurance" clauses are unenforceable in this equitable contribution case

5. On page 20 of the slip opinion, lines 3 and 4 of the DISPOSITION, delete the words "The amount of contribution is to be determined on remand."

Defendant's petition for rehearing is denied.

BY THE COURT:

_____
BLEASE, Acting P. J.

_____
HULL, J.

_____
HOCH, J.

Filed 4/11/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ARCH SPECIALTY INSURANCE COMPANY,<br><br>　　　　Defendant and Respondent. | C072500<br><br>(Super. Ct. No. 34-2010-00093381-CU-IC-GDS) |

　　　　APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne Wai Ling Chang, Judge.  Reversed with directions.

　　　　Gill & Rhoades, Susan J. Gill, Julie W. Rhoades, and Tyler G. Olpin for Plaintiff and Appellant.

　　　　Selman Brietman, Gregory J. Newman and Donald W. Montgomery for Defendant and Respondent.

1

Two insurers shared *indemnification* costs to settle claims made against mutual insureds in underlying construction defect litigation brought by third parties. But one insurer -- defendant Arch Specialty Insurance Company (Arch) -- refused to share the costs *to defend* the insureds in the underlying litigation. The other insurer -- plaintiff Certain Underwriters at Lloyds, London (Underwriters) -- paid all defense costs and now seeks equitable contribution from Arch. In ruling on cross-motions for summary judgment/adjudication (Code Civ. Proc., § 437c), the trial court concluded Arch had no duty to defend the insureds in the underlying litigation, because Arch's insurance policy expressly stated it had a duty to defend provided no "other insurance" afforded a defense, and Underwriters' policy did afford a defense. Underwriters appeals from summary judgment entered in favor of Arch and also challenges the trial court's denial of Underwriters' motion for summary adjudication of Arch's responsibility to contribute to defense costs.

We conclude Arch's "other insurance" clause cannot be enforced in this equitable contribution action between successive primary insurers. Enforcement of such a clause in a *primary* CGL policy would violate public policy. We also conclude Arch did not successfully circumvent this result by including the clause in the "coverage" section of the insurance policy as well as the "limitations" section. Accordingly, we reverse the judgment and direct the trial court to enter an order denying summary judgment to Arch and granting Underwriters' cross-motion for summary adjudication that Underwriters is entitled to equitable contribution. On remand, the trial court will determine the amount.

FACTS AND PROCEEDINGS

The parties assisted the trial court by agreeing to a "JOINT STIPULATION OF UNDISPUTED MATERIAL FACTS."

Underwriters and Arch were both primary insurers of Framecon, Inc. (Framecon) but at different times.

2

Underwriters issued a commercial general liability (CGL) policy to Framecon effective October 28, 2000 to October 28, 2001, and another CGL policy effective October 28, 2001 to October 28, 2002. These were the only CGL policies issued to Framecon for that two-year period, and Underwriters was the primary insurer for that period. The policies provided coverage for property damage only if caused by an occurrence in the coverage territory and the damage occurs during the policy period.

Arch issued a CGL policy to Framecon effective October 28, 2002, to October 28, 2003. That was Framecon's only CGL policy for that time period, and Arch was the primary insurer for that year. The Arch policy applied to property damage if caused by an occurrence during the policy period, whether or not such occurrence was known to the insured, and damage resulting from such occurrence first took place during the policy period. Claims involving continuous or progressively deteriorating property damage alleged to have occurred throughout successive policy periods may trigger coverage by all such primary CGL policies in effect during those periods. (*Montrose Chem. Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 689.) We need not address the matter because Arch does not dispute its duty to indemnify the insured in this case.

Between 1999 and April 2002, Framecon entered subcontracts to do carpentry and framing work on homes being developed by KB Home Sacramento, Inc., and KB Home North Bay, Inc. (collectively KB Home).

In October 2006, owners of some of those homes sued KB Home for construction defects, including some defects allegedly attributable to Framecon's work (the "Allen action"). KB home filed a cross-complaint against Framecon, seeking a defense and indemnity under the subcontracts.

Framecon tendered the cross-complaint to both Underwriters and Arch. KB Home tendered the complaint to both Underwriters and Arch, asserting it was an "additional insured" under Framecon's insurance policies. No one disputes that KB Home qualified as an additional insured.

3

Underwriters agreed to defend Framecon with a reservation of rights. Underwriters also agreed to defend KB Home as an additional insured, with a reservation of rights.

In September 2007, Arch sent a letter to Framecon, stating it was investigating the claim and further stating that, even if the policy afforded coverage for the claim, Arch would not pay for a defense. Based on the coverage terms of Arch's "insuring agreement," "in the event Framecon, Inc. is already being afforded a defense in this matter by another insurer, even if coverage were found to apply, [Arch's] policy would be excess with regard to defense of . . . Framecon." The letter further noted the intent of Arch's policy to be "excess" to any other insurance providing a defense under the excess provision of the "Conditions" section of Arch's insurance policy. Arch sent a similar letter to KB Home, invoking the "other insurance" provisions to deny a defense.

Arch's insurance policy contains two sections about the effect of "other insurance" on the duty to defend: (1) the coverage section and (2) the conditions section. The "coverage" section provides:

"COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY
"INSURING AGREEMENT
"a.  We will pay those sums that an insured becomes legally obligated to pay as tort damages for bodily injury or property damage to which this insurance applies. We have the right and duty to defend you, the Named Insured, against any suit seeking tort damages *provided that no other insurance affording a defense against such a suit is available to you*. Our duty to defend you is further limited as provided below or in the Section of the policy entitled 'EXCLUSIONS:  COVERAGES A AND B. . . .'" (Italics added; orig. emphasis omitted.)

This provision goes on to state that, in cases where Arch has no duty to defend, it nevertheless has the right to intervene in any suit in which the insured requests a defense

4

or indemnity, and "we will also defend you if you are not being defended by any other insurer."

The "conditions" section of Arch's policy states:

"SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

"8. OTHER INSURANCE, DEDUCTIBLES AND SELF-INSURED RETENTIONS

"If other insurance is available to an insured for a loss we cover under Coverage A or B of this policy, our obligations are limited as follows:

"a. Excess Insurance

"This insurance is excess over any other insurance, and over deductibles or self-insured amounts applicable to the loss, damage, or injury, whether such other insurance is primary, excess, contingent or contributing and whether an insured is a named insured or additional insured under said policy.

"When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or suit that any other insurer has a duty to defend." (Orig. emphasis omitted.)

As indicated, Arch stipulates it was the primary insurer and the only CGL policy issued to Framecon for the period from October 2002 to October 2003.

In contrast to the foregoing provisions, Underwriters' policies stated:

"COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

"1. Insuring Agreement

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages . . . to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result . . . ."

5

Underwriters' policies also contain as an endorsement the following:

"OTHER INSURANCE CLAUSE

"In consideration for the payment of premium, it is hereby understood and agreed that subsection 4. Other Insurance, of section IV Commercial General Liability Conditions, is deleted in its entirety and replaced by the following:

"4. Other Insurance

"a. Coverage provided under this policy is excess over any other collectable insurance, except:

"(1) when an Insured Contract specifically states that this insurance shall be primary and the policy is endorsed to be primary with respect to operations performed under that Insured Contract then this policy will be primary only with respect to those operations, performed under such Insured Contract, or

"(2) in the event that an excess or umbrella policy is purchased which lists this policy in the schedule of underlying insurance.

"b. When this insurance is excess we will have no duty to defend any claim or suit covered by other collectable insurance until the obligation of such other insurance to provide a defense has been met in its entirety."

Based on its "other insurance" provisions, Arch did not provide a defense to Framecon or KB Home.

In October 2009, the claims against Framecon in the Allen action were settled. Underwriters and Arch both agreed to indemnify Framecon for damages covered under each of their policies on a "time on the risk" basis for homes completed during each carrier's policy period. Underwriters paid $219,484.06, and Arch paid $114,015.17.

In 2008, other homeowners in the same development filed a complaint against KB Home (the Carter action). KB cross-complained against Framecon and sought a defense and indemnity as an additional insured. As with the Allen action, Underwriters defended Framecon and KB Home with a reservation of rights, while Arch refused to share defense

6

costs, invoking the "other insurance" language. In 2011, all claims against Framecon in the Carter action were settled. Underwriters and Arch both agreed to indemnify Framecon for damages covered under their respective policies on a "time on the risk" basis for homes completed during each carrier's policy period. Underwriters paid $79,200 and Arch paid $16,500 on behalf of Framecon.

Homeowners at a different development filed suit in 2006 (the Lamb action). Again, Underwriters provided a defense to Framecon and KB Home, and Arch refused to provide a defense based on the "other insurance" policy language. The Lamb action settled in 2008, with both carriers agreeing to indemnify Framecon for damages. Underwriters paid $21,250, and Arch paid $12,500.

Underwriters filed this lawsuit for declaratory relief and equitable contribution from Arch for the defense costs incurred in the underlying litigation. The operative amended complaint seeks (1) declaratory relief that Arch had a duty to defend Framecon in the underlying lawsuits, (2) equitable contribution from Arch to reimburse Underwriters for a portion of the costs Underwriters incurred to defend Framecon, (3) declaratory relief that Arch had a duty to defend KB Home as an additional insured, and (4) equitable contribution from Arch for Underwriters' costs to defend KB Home.

Underwriters filed a motion for summary adjudication that Arch had a duty to defend the insureds in the underlying litigation.

Arch filed a motion for summary judgment, arguing its "other insurance" provisions relieved it of any duty to defend.

The trial court denied Underwriters' motion for summary adjudication and granted summary judgment in favor of Arch. In its written order, the trial court adopted Arch's use of the term "exclusive defense" to refer to the provisions of its policy purporting to relieve it of a duty to defend if another insurance carrier has a duty to defend. We refer to them as "other insurance" clauses. The trial court accepted Arch's reliance on one case as assertedly holding that placing the "other insurance" clause in the "Insuring

Agreement" portion of the insurance policy defining coverage, as opposed to merely placing it in the conditions/limitations portion of the contract, makes the "other insurance" clause an enforceable exception from "coverage" (for defense costs) rather than a disfavored escape clause against public policy. The trial court disregarded cases invalidating such clauses, on the grounds they assertedly involved clauses placed only in the conditions/limitations portion of the contract or were otherwise distinguishable.

I

*General Legal Principles and Standard of Review*

" 'Equitable contribution is the right to recover from a co-obligor who shares a liability with the party seeking contribution.' " (*Underwriters of Interest Subscribing to Policy Number A15274001 v. ProBuilders Specialty Ins. Co*. (2015) 241 Cal.App.4th 721, 728 (*Underwriters of Interest*), citing *North American Capacity Ins. Co. v. Claremont Liability Ins. Co*. (2009) 177 Cal.App.4th 272, 295.) "[T]he right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action. . . . Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co*. (1998) 65 Cal.App.4th 1279, 1293 (*Fireman's Fund*).) The right to seek equitable contribution "is predicated on the commonsense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge

8

of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor. [Citations.] Equitable contribution thus assumes the existence of two or more valid contracts of insurance covering the particular risk of loss and the particular casualty in question." (*Id*. at p. 1295.)

The reciprocal rights and duties of multiple insurers who cover the same event do not arise out of contract, for their agreements are not with each other. (*Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co*. (1999) 75 Cal.App.4th 739, 749.) Their respective obligations flow from equitable principles designed to accomplish ultimate justice. Since these principles do not stem from agreement between the insurers, their application is not controlled by the language of their contracts with the respective policy holders. (*Ibid*.)

Although equitable contribution may call for judicial discretion, here the trial court expressly stated it decided the matter as a question of law, and our review is de novo. (*Underwriters of Interest, supra*, 241 Cal.App.4th at pp. 727-728; *GuideOne Mutual Ins. Co. v. Utica National Ins. Group* (2013) 213 Cal.App.4th 1494, 1501.)

II

*Arch Had Duty to Defend Despite "Other Insurance" Provisions*

Underwriters argue Arch's policy terms -- excusing it from a duty to defend when another insurer has a duty to defend -- are unenforceable "escape clauses" against public policy, regardless of their location in the insurance policy. Arch does not dispute that its insurance policy required it to *indemnify* the insureds for the damages at issue in the construction defect litigation. And Arch did pay its share of the indemnification costs. Although Arch's insurance policy afforded "coverage" for this risk, Arch maintains its policy did not afford "coverage" for defense costs related to this risk, because Arch

9

included the "other insurance" language in the "coverage" section of its policy. We conclude Underwriters has the better argument.

The original purpose of "other insurance" clauses was to prevent multiple recovery by insureds in cases of overlapping policies providing coverage for the same loss. (*Dart Industries, Inc. v. Commercial Union Ins. Co*. (2002) 28 Cal.4th 1059, 1079-1080 (*Dart*).) "On the other hand, 'other insurance' clauses that attempt to shift the burden away from one *primary* [italics added] insurer wholly or largely to other insurers have been the objects of judicial distrust. '[P]ublic policy disfavors "escape" clauses, whereby coverage purports to evaporate in the presence of other insurance. [Citations.] This disfavor should also apply, to a lesser extent, to excess-only clauses, by which carriers seek exculpation whenever the loss falls within another carrier's policy limit.' [Citations.] Partly for this reason, the modern trend is to require equitable contributions on a pro rata basis from all primary insurers regardless of the type of 'other insurance' clause in their policies. [Citations.]" (*Ibid*.) *Dart* rejected a primary insurer's contention that its obligations were cancelled by the insured's inability to prove the type of other-insurance clause in the lost contract. Even if the primary insurer had a " 'null and void with excess' " other-insurance clause, that would merely entitle the primary insurer to seek contribution from other insurers; it would not affect its obligation to its insured. (*Id*. at pp. 1080-1081.)

Arch does not dispute that its policy was primary, not excess. " 'Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches *immediately* upon the happening of the occurrence that gives rise to liability. [Citation.] Primary insurers generally have the primary duty of defense. [¶] "Excess" or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted.' [Citation.]" (*Century Surety Co. v. United Pacific Ins. Co.* (2003) 109 Cal.App.4th 1246, 1255 (*Century*), italics omitted.)

10

In *Century*, an insured subcontractor tendered defense of a lawsuit to four successive CGL insurers that provided coverage over a five-year period. Three insurers accepted the tender and ultimately settled the suit, but the fourth insurer (Century) refused to provide a defense on the ground its policy contained an "other insurance" clause that " 'If other valid and collectible insurance is available to any insured for a loss we cover under Coverage A or B of this Coverage Part, then this insurance is excess of such insurance and we will have no duty to defend any claim or "suit" that any other insurer has a duty to defend.' " (*Id*. 109 Cal.App.4th at p. 1252.) The other carriers' policies stated that, if other primary insurance applied, costs would be shared. (*Id* at pp. 1251-1252.) In Century's declaratory relief action, the appellate court held Century was required to contribute. Century's contract was the only policy that expressly provided the insured with coverage during that part of the five-year period. Since the underlying suit involved continuing loss liability, there were multiple insurers involved. But Century was not a true excess or secondary insurer, but rather was one of the primary insurers on the claim. (*Id*. at pp. 1256-1260.)

"[E]xcess insurance is insurance that is expressly understood by both the insurer and insured to be secondary to specific underlying coverage which will not begin until *after* that underlying coverage is exhausted and which does not broaden that underlying coverage. [Citation.] *That is not the kind of 'excess' insurance involved in this case*. [¶] The 'excess' insurance problem before us arises when one insurer attempts, through the use of a so-called other insurance clause, to reduce a primary coverage obligation into a more limited excess liability. 'Insurance policies commonly include "other insurance" provisions which "attempt to limit the insurer's liability to the extent that other insurance covers the same risk." [Citation.] One subcategory is known as "pro rata" provisions, which look to limit the insurer's liability to "the total proportion that its policy limits bear to the total coverage available to the insured." [Citation.] There is another subcategory known as "excess only" clauses, which require the exhaustion of other insurance; in

11

effect, this insurer does not provide primary coverage but only acts as an excess insurer. [Citation.] A final subcategory of "escape" clauses extinguishes the insurer's liability if the loss is covered by other insurance. [Citations.]' [Citation.]" (*Century, supra*, 109 Cal.App.4th at p. 1255, orig. italics.)

" ' "Escape" clauses came to be so named because they permit an insurer to make a seemingly ironclad guarantee of coverage, only to withdraw that coverage (and thus escape liability) in the presence of other insurance. [Citation.] When "excess only" clauses are found in *primary* [italics added] liability policies, they are treated the same way as escape clauses. [Citations.] Because these types of provisions are disfavored, courts have developed a method of overriding them - "When two or more applicable policies contain such clauses, both liability and the costs of defense should ordinarily be prorated according to the amount of coverage afforded." [Citation.] The reason for this rule is that the conflicting provisions are deemed essentially irreconcilable; if given effect competing clauses would strand an insured between insurers disclaiming coverage . . . Courts have found for the pro rata solution when confronted by a variety of conflicts between differing types of "other insurance" provisions. . . . [¶] A predicate for prorating policies with conflicting "other insurance" provisions is that the policies operate on the *same* level of coverage, that is to say, two or more policies apply to the *same* damage or loss suffered by the *same* party. [Citations.] Put another way, "an 'other insurance' dispute can only arise between carriers on the same level, it cannot arise between excess and primary insurers." [Citation.]' " (*Century, supra*, 109 Cal.App.4th at p. 1256.)

In *Travelers Casualty & Surety Co. v. Century Surety Co.* (2004) 118 Cal.App.4th 1156 (*Travelers*), Century issued a primary CGL policy to a framing contractor, containing an endorsement that if other insurance was available for a loss covered by the Century policy, Century's policy would be excess of such insurance, and Century would have no duty to defend any claim that the other insurer had a duty to defend. (*Id.* at

p. 1158.) Home buyers sued the contractor, alleging continuing damage to their properties from defective construction work. Century declined to provide a defense because Travelers -- which had issued CGL policies for prior years -- provided a defense (under a policy calling for sharing costs with any other primary insurer). (*Ibid*.) The appellate court held Travelers was entitled to equitable contribution from Century for defense and indemnification costs. The court said the insured had no other liability insurance during the time that Century's policy was in effect. Both carriers' policies covered the same type of loss but had conflicting "other insurance" clauses. Giving effect to Century's clause, which was in the nature of an escape clause, would result in imposing on Travelers a burden of shouldering that portion of a continuing loss attributable to the time when Century was the only liability insurer covering the insured. (*Id*. at pp. 1161-1162.)

Here, Arch persuaded the trial court -- and argues on appeal -- that the California cases invalidating "other insurance" clauses are distinguishable because the clauses in those cases were located only in the conditions section of the insurance policies, not in the coverage section. However, even assuming the other-insurance clauses in the California cases relied upon by Underwriters were located in the exclusions section rather than the coverage section of the policies, none of the cases discussed or decided that the location mattered. Underwriters did cite one federal district court case -- *USF Ins. Co. v. Clarendon Am. Ins. Co*. (C.D. Cal. 2006) 452 F.Supp.2d 972 (*USF*) -- which declined to enforce an "other insurance" clause that was located in the coverage section of an insurance policy. There, however, the same clause appeared in the coverage section of the other insurers' policies. (*Id*. at p. 1002 [identical provisions in the policies are mutually irreconcilable].) Here, the clauses were not identical, and we therefore do not rely on *USF*.

Arch invokes general principles that an insurer's duty to defend is not absolute but is measured by the nature and kinds of risks covered by the policy (*Rosen v. Nations Title*

13

*Ins. Co.* (1997) 56 Cal.App.4th 1489, 1497 [no duty to defend because loss was not covered under the policy]), that limitations on a promised defense duty must be conspicuous, plain, and clear (*Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 30 [subcontractor's insurer had duty to defend contractor as additional insured despite policy language that the insurance applied only to the extent the contractor was held liable for subcontractor's conduct]), and that coverage under an insurance policy is determined in the first instance by referring to the policy's insuring agreement, which defines the risk undertaken by the insurer. (*1119 Delaware v. Continental Land Title Co.* (1993) 16 Cal.App.4th 992, 1003 [title policy's failure to disclose conditional use permit came within insuring clause affording coverage against loss sustained by reason of any "encumbrance" on the property and was not expressly excluded under any policy exclusions].)

However, none of these general principles answer the more specific public policy questions presented in this case.

While this appeal was pending, the Fourth Appellate District published *Underwriters of Interest, supra*, 241 Cal.App.4th 721, which held unenforceable an "other insurance" clause purporting to relieve a primary insurer (ProBuilders) of its duty to defend, despite clearly having a duty to indemnify. ProBuilders contributed toward the indemnification costs in the construction defect case against the insured contractor but resisted defense costs, based on its other-insurance clause that ProBuilders had the "duty to defend . . . against any suit seeking . . . damages [to which the insurance applied] provided that no other insurance affording a defense against such a suit is available to you." (*Id*. at p. 724.) The plaintiff's policy said it would be excess over any other primary insurance available to the contractor as an additional insured. (*Id*. at p. 724, fn. 1.) "The courts have repeatedly addressed -- and rejected -- arguments by insurers that an 'other insurance' clause in their insuring agreement permitted them to evade their obligations by shifting the entire burden associated with defending and indemnifying a

14

mutual insured onto a co-insurer. . . . [W]hen 'the "other insurance" clause . . . is written into an otherwise primary policy, the courts have considered this type of "other insurance" clause as an "escape" clause, a clause which attempts to have coverage, paid for with the insured's premiums, evaporate in the presence of other insurance. [Citations.] Escape clauses are discouraged and generally not given effect in actions where the insurance company who paid the liability is seeking equitable contribution from the carrier who is seeking to avoid the risk it was paid to cover.' Numerous courts have therefore rejected 'other insurance' clauses as a basis for avoiding contribution. [Citations.]." (*Underwriters of Interest, supra*, 241 Cal.App.4th at p. 731.)

In *Underwriters of Interest*, the plaintiff's CGL policy provided primary coverage for the common insured for a specified period of time (October 2001 to October 2003), and defendant ProBuilders' policies provided primary coverage for the common insured for a different but overlapping period of time (December 2002 to December 2004), and the allegations of the third-party action asserted the common insured caused damage to the homes by allegedly defective construction work, including some claims for which ProBuilders potentially provided the *only* primary policy. (*Id*. 241 Cal.App.4th at pp. 724, 731-732.) Because giving effect to its "other insurance" provision, in the nature of an escape clause, would result in imposing on the plaintiff the burden of shouldering that portion of defense costs attributable to claims arising from a time when ProBuilders was the *only* liability insurer, the escape clause must be disregarded. (*Id*. at p. 732.) Where there are "successive primary insurers and the claim by the third party involved a continuing-loss liability coverage over the span covered by multiple insurers," the court should decline to allow one of those insurers to employ an "other insurance" escape clause to avoid equitable contribution. (*Ibid*.) The court was unpersuaded by the defendant's argument that escape clauses should be enforced as long as the insured is not left without coverage. (*Id*. at pp. 732-733.)

Here too, Arch's policy made Arch liable for defense costs, but then purported to extinguish that obligation when other insurance afforded a defense ("We have the . . . duty to defend you . . . provided that no other insurance" is available.) Here too, enforcing Arch's clause would result in imposing on Underwriters the burden of shouldering a portion of defense costs attributable to claims arising from a time when Arch was the *only* insurer. Here too, the "other insurance" provision was an escape clause that must be disregarded.

In defending the judgment, Arch relies (as did the trial court) on *Chamberlin v. Smith* (1977) 72 Cal.App.3d 835 (*Chamberlin*), which held an insurer successfully escaped responsibility by placing the "other insurance" clause not only in the "conditions" portion of the policy but also in the "coverage" section. However, *Chamberlin* predated the "modern trend" extending the distrust of escape clauses to "other insurance" clauses that attempt to shift the burden away from a primary insurer, as noted in the 2002 opinion of *Dart, supra*, 28 Cal.4th at pages 1079-1080.

Moreover, *Chamberlin* is materially distinguishable. It involved attorney malpractice insurance. The insured lawyer made a mistake in November 1968 that induced his client to enter an unenforceable agreement on December 17, 1968. (*Id.* 72 Cal.App.3d at p. 840.) At the time, the lawyer was insured by Mission Insurance Company, but that policy expired at the end of 1968. The client filed suit against the lawyer in December 1970, at which time the lawyer was insured by Reserve Insurance Company.

Reserve undertook the defense of the lawyer under a reservation of rights, settled the malpractice suit (with contribution from Mission), and sued to recover defense costs from Mission. (*Chamberlin, supra*, 72 Cal.App.3d at pp. 840-841.) The appellate court held Reserve had no responsibility for the loss. Reserve's insurance policy contained "the following limitation on its coverage: 'This policy applies only to acts, errors or omissions . . . which occurred prior to the effective date of the policy, and then only if

16

such claim is made during the policy period *provided* (1) [the insured had no knowledge of the mistake when the policy took effect] and (2) *there is no other insurance applicable to such act, error, or omission . . . .'*" (*Id*. at p. 847, italics added.)  The court concluded Reserve's policy did not cover the attorney negligence, because the attorney had knowledge of his mistake before the effective date of Reserve's policy.  (*Id*. at pp. 848, 850.)  *Chamberlin* went on to conclude "the second condition" of the Reserve policy was not met in that there was, in fact, "other insurance" applicable to the error, i.e., the Mission policy (though Mission's policy also had an "other insurance" clause).  (*Id*. at p. 848.)  Thus, Mission had to reimburse Reserve.

*Chamberlin* rejected Mission's argument that Reserve's "other insurance" clause was an unenforceable escape clause.  (*Id*. 72 Cal.App.3d at p. 848.)  The court said the doctrine disfavoring escape clauses "should be applied with caution in the case of successive attorney malpractice insurance policies where the error or omission occurs during the life of one policy, and the claim is made during the life of another.  Attorney malpractice insurance policies are somewhat unique.  Ordinarily an insurance policy will only cover liability for an occurrence during a period covered by the insurance.  Attorney malpractice insurance will often contain a 'claims made' clause which will cover the insured for all claims made during the life of the policy regardless of when the error or omission occurred." (*Id*. 72 Cal.App.3d at pp. 848-849.)  There is a "distinction between an indemnity against liability and an indemnity against loss . . . 'in the former the essence of the contract is that the event shall not happen while in the latter the indemnity is against the consequences of the event if it should happen.'" (*Id*. at p. 849.)

*Chamberlin* said the "other insurance" clause in Mission's policy was in the "conditions" section of the policy and appeared to be a (disfavored) escape clause.  (*Id*. at p. 850.)  The "other insurance" clause in the "conditions" section of Reserve*'s* policy, while not an escape clause, was a composite pro rata-excess clause.  (*Ibid*.)  The court said the purpose of the two clauses, each in a different way, was to limit liability in the

17

event there is other insurance coverage for a loss covered by the policy. (*Ibid*.) "However, the deliberate statement in the 'Insuring Agreements' part of the Reserve policy that there will be no coverage for an act, error or omission that occurred prior to the effective date of the policy if there is other insurance is not an escape clause, it is an exception from coverage. Moreover, it is reasonable not to provide coverage where the act, error or omission occurred during the life of an earlier policy. After all, Reserve could have provided no coverage at all for acts, errors or omissions occurring prior to the effective date of its policy. . . . [T]he interpretation to be given words may depend on the use of the words in the instrument where they appear." (*Ibid*.)

*Chamberlin* continued: "Thus, it appears that Reserve's policy affords no coverage for acts or omissions that occurred prior to its policy period if there is other insurance. However, if other insurance does not completely cover the insured's liability, then Reserve's policy provides excess coverage . . . [and] the loss will be prorated between Reserve and the other insurance company. [¶] It is well recognized that an insurance company has an unquestionable right to limit the coverage of the policy issued by it; and, when it has done so, the plain language of the limitation must be respected." (*Id*. 72 Cal.App.3d at p. 850.)

Thus, in *Chamberlin*, the "other insurance" clause in the coverage section was not just about duty to defend. It actually limited coverage (duty to indemnify) by stating the policy itself applied only if there was no other insurance for the insured's error or omission. Here, although Arch placed an "other insurance" clause in the coverage section of its policy, the clause addressed only duty to defend, not duty to indemnify. Arch does not dispute the policy itself applied to the loss. The duty to defend is broader than the duty to indemnify and is measured by the nature and kinds of risks covered by the policy. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc*. (2014) 59 Cal.4th 277, 287-288.) Additionally, we see merit in a point made by a federal appellate court in Maine, which criticized *Chamberlin*'s reliance on location of the clause in the coverage

18

section as determinative, calling it " 'semantic microscopy' " that "would tend to encourage insurers to jockey for best position in choosing where to locate 'other insurance' language, needlessly complicating the drafting of policies, inducing wasteful litigation among insurers, and delaying settlements -- all ultimately to the detriment of the insurance-buying public." (*Home Ins. Co. v. St. Paul Fire & Marine Ins. Co.* (1st Cir. 2000) 229 F.3d 56, 62-63.) Though this federal case applying Maine law is not binding on us, the point is consistent with California law.

Arch argues we should enforce its other-insurance clause, because enforcement takes no risk that the insured would be left without coverage. Arch cites a case which enforced a clause because it would not leave the insured stranded between insurers disclaiming coverage. (*Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* (2003) 110 Cal.App.4th 710, 727.) The appellate court noted that leaving an insured stranded was an equitable consideration which led other courts to ignore other-insurance clauses. (*Ibid.*) However, the appellate court also explained its decision turned on the fact that the "policies in this case contain narrow exceptions to their operation as primary insurance. There are no broad 'excess only' clauses in either policy that purport to make the coverage excess whenever there is other insurance. Both policies declare themselves to be excess in the situation where the parties and the insurers are most likely to intend that result -- when the insured is covered as an additional insured on another party's policy for some specific event or situation." (*Id.* at p. 726.) Here, in contrast, Arch's other-insurance clause is not limited to a specific factual situation but purports to apply whenever there is other insurance.

Moreover, the risk of leaving an insured stranded without coverage is not the only public policy consideration. "[I]mposing the entire liability for a loss on the insurer with a policy providing for pro rata coverage would annul that policy's language, and create the anomaly that courts will only predictably enforce proration between policies when they all have conflicting 'excess other insurance' language *barring* proration. [Citations.]

19

Giving 'excess other insurance' clauses priority over policies providing for pro rata apportionment of liability among policies is completely unrelated to the original historical purpose of such 'other insurance' clauses, which was to prevent multiple recoveries by *insureds* in cases of overlapping insurance policies providing coverage for the same loss." (*Fireman's Fund, supra*, 65 Cal.App.4th at p. 1306, orig. italics.)

We conclude Underwriters is entitled to receive equitable contribution from Arch. Thus, the trial court erred in granting summary judgment to Arch and in denying summary adjudication to Underwriters.

DISPOSITION

The judgment is reversed with directions to vacate the order dated October 10, 2012, and enter a new order denying Arch's motion for summary judgment and granting Underwriters' motion for summary adjudication. The amount of contribution is to be determined on remand. Underwriters will recover its costs on this appeal. (Cal. Rules of Court, rule 8.278(a).)


      HULL      , J.


We concur:


      BLEASE      , Acting P. J.


      HOCH      , J.